**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

LIBERTY MUTUAL INSURANCE COMPANY, LIBERTY MUTUAL FIRE INSURANCE COMPANY, LIBERTY INSURANCE CORPORATION, THE FIRST LIBERTY INSURANCE CORPORATION, LM INSURANCE CORPORATION, LIBERTY MUTUAL MID-ATLANTIC INSURANCE COMPANY, LIBERTY COUNTY MUTUAL INSURANCE COMPANY, LM PROPERTY AND CASUALTY INSURANCE COMPANY, SAFECO COMPANY OF INDIANA, and AMERICAN STATES INSURANCE COMPANY,

Plaintiffs,

-against-

DIDIER DEMESMIN, M.D., NEW YORK PAIN MEDICINE ASSOCIATE, PLLC, UNIVERSITY PAIN MEDICINE CENTER, LLC, and STEMMEE, LLC,

Defendants.

Docket No.: _______( )

**Plaintiffs Demand a Trial by Jury**

## COMPLAINT

Plaintiffs Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation, The First Liberty Insurance Corporation, LM Insurance Corporation, Liberty Mutual Mid-Atlantic Insurance Company, Liberty County Mutual Insurance Company, LM Property and Casualty Insurance Company, Safeco Company of Indiana, and American States Insurance Company (collectively, "Liberty Mutual" or "Plaintiffs"), as and for their Complaint against the Defendants, hereby allege as follows:

## NATURE OF THE ACTION

1. This action seeks to recover more than $1,189,000.00 that the Defendants wrongfully obtained from Liberty Mutual by submitting, and causing to be submitted, thousands of fraudulent and unlawful no-fault ("personal injury protection" or "PIP") insurance charges through New York Pain Medicine Associate, PLLC ("NY Pain"), University Pain Medicine

Center, LLC ("University Pain"), and Stemmee, LLC ("Stemmee"), (collectively the "Entity Defendants") for purported examinations, electrodiagnostic ("EDX") testing, pain management injections, and surgical facility fees (collectively the "Fraudulent Services").

2. The Fraudulent Services were provided, to the extent that they were provided at all, to individuals ("Insureds") who claimed to have been involved in automobile accidents and were eligible for insurance coverage under Liberty Mutual no-fault insurance policies.

3. In addition, Liberty Mutual seeks a declaration that it is not legally obligated to pay reimbursement of more than $75,000.00 in pending no-fault insurance claims that have been submitted by or on behalf of NY Pain, University Pain, and Stemmee, because of the fraudulent and unlawful conduct described herein.

4. The Defendants fall into the following categories:

(i) Defendant NY Pain is a New York medical professional limited liability company through which many of the Fraudulent Services purportedly were provided and were billed to insurance companies, including Liberty Mutual in New York and New Jersey.

(ii) Defendant University Pain is a New Jersey limited liability company through which many of the Fraudulent Services purportedly were provided and were billed to insurance companies, including Liberty Mutual in New York and New Jersey.

(iii) Defendant Stemmee is a New Jersey medical professional limited liability company through which many of the Fraudulent Services purportedly were provided and were billed to insurance companies, including Liberty Mutual in New York and New Jersey.

(iv) Defendant Didier Demesmin, M.D. ("Demesmin") is a physician who was licensed to practice medicine in New York on or about May 28, 2003, and in New Jersey on or about April 27, 2005. Demesmin owned and controlled University Pain, NY Pain, and Stemmee, and used University Pain, NY Pain, and Stemmee as vehicles to submit fraudulent and unlawful no-fault insurance billing for the Fraudulent Services to insurance companies, including Liberty Mutual in New York and New Jersey.

5. As discussed below, the Defendants at all relevant times have known that:

(i) the Defendants paid and received unlawful compensation in exchange for patient referrals;

(ii) the Defendants engaged in an unlawful self-referral scheme;

(iii) the Fraudulent Services were not medically necessary, and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(iv) in many cases, the Fraudulent Services never were provided in the first instance;

(v) the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to Liberty Mutual; and

(vi) the Fraudulent Services were not provided in compliance with relevant laws and regulations governing health care practice and, as a result, were not eligible for no-fault reimbursement in the first instance.

6. As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that they billed or caused to be billed to Liberty Mutual. The charts annexed hereto as Exhibits "1" – "3" set forth large representative samples of the fraudulent claims that have been identified to-date that the respective Defendants submitted, or caused to be submitted, to Liberty Mutual via the mail.

7. The Defendants' fraudulent and unlawful scheme began no later than 2020 and has continued uninterrupted since that time. As a result of the Defendants' scheme, Liberty Mutual has incurred damages of more than $1,189,000.00.

## THE PARTIES

### I. Plaintiffs

8. Plaintiffs Liberty Mutual Insurance Company and Liberty Mutual Mid-Atlantic Insurance Company are Massachusetts corporations with their principal places of business in Boston, Massachusetts. Liberty Mutual Insurance Company and Liberty Mutual Mid-Atlantic

Insurance Company are authorized to conduct business and to issue policies of automobile insurance in the States of New York and New Jersey.

9. Plaintiffs Liberty Insurance Corporation, The First Liberty Insurance Corporation and LM Insurance Corporation are Illinois corporations with their principal places of business in Boston, Massachusetts. Liberty Insurance Corporation, The First Liberty Insurance Corporation and LM Insurance Corporation are authorized to conduct business and to issue policies of automobile insurance in the States of New York and New Jersey.

10. Plaintiff Liberty Mutual Fire Insurance Company is a Wisconsin corporation with its principal place of business in Boston, Massachusetts. Liberty Mutual Fire Insurance Company is authorized to conduct business and to issue policies of automobile insurance in the States of New York and New Jersey.

11. Plaintiff Liberty County Mutual Insurance Company is a Texas corporation with its principal place of business in Boston, Massachusetts. Liberty County Mutual Insurance Company is authorized to conduct business and to issue policies of automobile insurance in the States of New York and New Jersey.

12. Plaintiffs LM Property and Casualty Insurance Company, Safeco Company of Indiana, and American States Insurance Company are Indiana corporations with their principal places of business in Boston, Massachusetts. LM Property and Casualty Insurance Company, Safeco Company of Indiana, and American States Insurance Company are authorized to conduct business and to issue policies of automobile insurance in the States of New York and New Jersey.

## II. Defendants

13. Defendant NY Pain is a New York medical professional limited liability company with its principal place of business in New York. NY Pain was established in New York on or

about March 10, 2020, was owned and controlled by Demesmin, had Demesmin as its member, and was used by Demesmin as a vehicle to submit fraudulent and unlawful no-fault insurance billing to Liberty Mutual and other insurers in New York and New Jersey.

14. Defendant University Pain is a New Jersey limited liability company with its principal place of business in New Jersey. University Pain was established in New Jersey on or about September 20, 2007, was owned and controlled by Demesmin, had Demesmin as its member, purported to operate as a medical practice, and was used by Demesmin as a vehicle to submit fraudulent and unlawful no-fault insurance billing to Liberty Mutual and other insurers in New York and New Jersey.

15. Defendant Stemmee is a New Jersey limited liability company with its principal place of business in New Jersey, that operated as an ambulatory care facility/ambulatory surgery center. Stemmee was established in New Jersey on or about March 2, 2017, was owned and controlled by Demesmin, had Demesmin as its member, purported to operate as a surgical practice, and was used by Demesmin as a vehicle to submit fraudulent and unlawful no-fault insurance billing to Liberty Mutual and other insurers in New York and New Jersey.

16. Defendant Demesmin resides in and is a citizen of New Jersey, and was licensed to practice medicine in New York on or about May 28, 2003, and in New Jersey on or about April 27, 2005. Demesmin owned, controlled, and was the member of University Pain, NY Pain, and Stemmee, purported to perform many of the Fraudulent Services at University Pain, NY Pain, and Stemmee, and used University Pain, NY Pain, and Stemmee as vehicles to submit fraudulent and unlawful no-fault insurance billing to Liberty Mutual and other insurers in New York and New Jersey.

## JURISDICTION AND VENUE

17. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the total matter in controversy, exclusive of interest and costs, exceeds the jurisdictional threshold of $75,000.00, and is between citizens of different states.

18. This Court also has original jurisdiction pursuant to 28 U.S.C. § 1331 over claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act).

19. In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

20. Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

21. For example, the Defendants transacted and solicited substantial business in New York, derived a substantial amount of revenue based on their fraudulent and unlawful business activities in New York, and committed tortious acts that caused injury to Liberty Mutual in New York.

## ALLEGATIONS COMMON TO ALL CLAIMS

### I. An Overview of the Pertinent Law Governing No-Fault Insurance Reimbursement

### A. Pertinent New York Law Governing No-Fault Insurance Reimbursement

22. New York's no-fault insurance laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the health care services that they need.

23. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.), automobile insurers are required to provide no-fault insurance benefits ("Personal Injury Protection" or "PIP Benefits") to Insureds.

24. In New York, PIP Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for health care goods and services.

25. In New York, an Insured can assign their right to PIP Benefits to health care goods and services providers in exchange for those services.

26. In New York, pursuant to a duly executed assignment, a health care provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3") or by using the Health care Financing Administration insurance claim form (known as the "HCFA-1500 form" or "CMS-1500 form").

27. Pursuant to the New York no-fault insurance laws, health care services providers are not eligible to bill for or to collect PIP Benefits if they fail to meet any New York State or local

licensing requirements necessary to provide the underlying services, or if they fail to meet the applicable licensing requirements in any other states in which such services are performed.

28. For instance, the implementing regulation adopted by the New York Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York or meet any applicable licensing requirement necessary to perform such service in any other state in which such service is performed.

29. Pursuant to the New York Education Law, foreign medical professional entities operating in New York must apply for authority to do business in New York and must have a certificate of authority from the New York Department of Education. See, e.g., N.Y. Educ. Law §§ 6509(8), 6530(12); N.Y. Bus. Corp. Law §§ 1503, 1514, 1530.

30. Foreign medical professional entities that operate in New York without obtaining the requisite certificate of authority and authorization are not eligible to receive PIP Benefits.

31. New York law prohibits licensed healthcare providers from paying or accepting payments in exchange for patient referrals. See, e.g., New York Education Law §§ 6509-a; 6530(18); and 6531.

32. In addition, New York law prohibits licensed health care services providers, including physicians, from referring patients to health care practices in which they have an ownership or investment interest unless: (i) the ownership or investment interest is disclosed to the patient; and (ii) the disclosure informs the patient of his or her “right to utilize a specifically identified alternative health care provider if any such alternative is reasonably available”. See New York Public Health Law § 238-d.

33. In New York, claims for PIP Benefits are governed by the New York Workers' Compensation Fee Schedule (the "NY Fee Schedule").

34. When a health care services provider submits a claim for PIP Benefits using the current procedural terminology ("CPT") codes set forth in the NY Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable laws and regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

35. Pursuant to New York Insurance Law § 403, the NF-3 and HCFA-1500 forms submitted by a health care services provider to Liberty Mutual, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

**B. Pertinent New Jersey Law Governing No-Fault Insurance Reimbursement**

36. Like New York, New Jersey has a comprehensive statutory system designed to ensure that motor vehicle accident victims are compensated for their injuries. The statutory system is embodied within the Compulsory Insurance Law (N.J.S.A. 39:6B–1 to 3) and the Automobile Reparation Reform Act (N.J.S.A. 39:6A–1 et seq.), which require automobile insurers to provide PIP Benefits to Insureds.

37. As in New York, under the New Jersey no-fault laws, an Insured can assign his or her right to PIP Benefits to health care services providers in exchange for those services. Pursuant to a valid assignment of PIP Benefits, a health care services provider may submit claims directly

to an insurance company in order to receive payment for medically necessary services, using the required claim forms, including the HCFA–1500 form.

38. In order for a health care services provider to be eligible to receive PIP Benefits under the New Jersey no-fault laws, it must comply with all significant laws and regulations governing health care practice in New Jersey.

39. Thus, a health care services provider is not entitled to receive PIP Benefits where it has failed to comply with all significant statutory and regulatory requirements governing health care practice in New Jersey, whether or not the underlying services were medically necessary or actually provided.

40. Moreover, in order for a specific health care service to be eligible for PIP reimbursement, the service itself must be provided in compliance with all significant laws and regulations governing health care practice in New Jersey.

41. By extension, insurers such as Liberty Mutual are not obligated to make any payments of PIP Benefits to health care services providers that are not in compliance with all significant statutory and regulatory requirements governing health care practice in New Jersey.

42. Furthermore, insurers such as Liberty Mutual are not obligated to make any payments of PIP Benefits for health care services that are not rendered in compliance with all significant statutory and regulatory requirements governing health care practice in New Jersey.

43. Pursuant to N.J.A.C. 13:35-6.16, a foreign limited liability company may not lawfully operate as a medical practice in New Jersey.

44. Insurers are not required to pay PIP Benefits for medical services that are unlawfully provided in New Jersey through foreign limited liability companies.

45. Pursuant to N.J.A.C. 13:35-6.17, physicians are prohibited from paying or receiving compensation, either directly or indirectly, in exchange for patient referrals.

46. Among other things, N.J.A.C. 13:35-6.17(c)(1) specifies that:

> A licensee shall not, directly or indirectly, give to or receive from any licensed or unlicensed source a gift of more than nominal (negligible) value, or any fee, commission, rebate or bonus or other compensation however denominated, which a reasonable person would recognize as having been given or received in appreciation for or to promote conduct by a licensee including: purchasing a medical product, ordering or promoting the sale or lease of a device or appliance or other prescribed item, prescribing any type of item or product for patient use or making or receiving a referral to or from another for professional services. For example, a licensee who refers a patient to a health care service (such as a cardiac rehabilitation service or a provider of durable medical equipment or a provider of testing services) shall not accept from nor give to the health care service a fee directly or indirectly in connection with the referral, whether denominated as a referral or prescription fee or examination or supervision fee or space leasing in which to render the services (other than as permitted in (h) below), or by any other name ….

47. N.J.A.C. 13:35-6.17(c)(1)(ii) specifies that "[t]his section shall be construed broadly to effectuate its remedial intent."

48. In keeping with the broad anti-kickback prohibitions in N.J.A.C. 13:35-6.17(c)(1), N.J.A.C. 13:35-6.17(h) provides, in pertinent part, that:

> A Board licensee may lease space or medical equipment to or from another licensed health care professional to whom patients are referred, <u>only where rent is a fixed fee set in advance and determined by the fair market value, or less, and is for a regular term and not for sporadic use of the space or equipment.</u>

(Emphasis added).

49. Physicians and medical practices that pay or receive unlawful compensation in exchange for patient referrals are not eligible to collect PIP Benefits.

50. In New Jersey, with limited exceptions that are not applicable here, "practitioners" generally may not refer patients to a health care practice in which they have a "significant beneficial interest".

51. Specifically, N.J.S.A. 45:9–22.5 (the "Codey Law") provides – in pertinent part – that:

> A practitioner shall not refer a patient or direct an employee of the practitioner to refer a patient to a health care service in which the practitioner, or the practitioner's immediate family, or the practitioner in combination with the practitioner's immediate family has a significant beneficial interest ….

52. Pursuant to N.J.S.A. 45:9–22.4:

> "Practitioner" means a physician, chiropractor or podiatrist licensed pursuant to Title 45 of the Revised Statutes.
>
> "Health care service" means a business entity which provides on an inpatient or outpatient basis: testing for or diagnosis or treatment of human disease or dysfunction; or dispensing of drugs or medical devices for the treatment of human disease or dysfunction. Health care service includes, but is not limited to, a bioanalytical laboratory, pharmacy, home health care agency, rehabilitation facility, nursing home, hospital, or a facility which provides radiological or other diagnostic imagery services, physical therapy, ambulatory surgery, or ophthalmic services.
>
> "Significant beneficial interest" means any financial interest; but does not include ownership of a building wherein the space is leased to a person at the prevailing rate under a straight lease agreement, or any interest held in publicly traded securities.

53. Pursuant to N.J.S.A. 45:9–22–5(c)(1), the Codey Law's restrictions on patient referrals do not apply to:

> medical treatment or a procedure that is provided at the practitioner's medical office and for which a bill is issued directly in the name of the practitioner or the practitioner's medical office ….

54. Pursuant to N.J.S.A. 45:9-22-5(c)(3), the Codey Law's restrictions on patient referrals also do not apply to referrals for certain procedures performed at an ambulatory care facility, such as an ambulatory surgery center, or at a registered surgical practice, so long as certain conditions are met (the "ASC Exception").

55. In particular, and as set forth in N.J.S.A. 45:9-22-5(c)(3), prior to January 2019 the Codey Law's restrictions did not apply to:

ambulatory surgery or procedures requiring anesthesia performed at a surgical practice registered with the Department of Health . . . or at an ambulatory care facility licensed by the Department of Health to perform surgical and related services or lithotripsy services, if the following conditions are met:

(a) the practitioner who provided the referral personally performs the procedure;

(b) the practitioner's remuneration as an owner of or investor in the practice or facility is directly proportional to the practitioner's ownership interest and not to the volume of patients the practitioner refers to the practice or facility;

(c) all clinically-related decisions at a facility owned in part by non-practitioners are made by practitioners and are in the best interests of the patient; and

(d) disclosure of the referring practitioner's significant beneficial interest in the practice or facility is made to the patient in writing, at or prior to the time that the referral is made, consistent with the provisions of section 3 of P.L. 1989, c. 19 (C.45:9-22.6).

56. After January 2019, the Codey Law's restrictions did not apply to:

ambulatory surgery or procedures involving the use of any anesthesia performed at a surgical practice registered with the Department of Health . . . or at an ambulatory care facility licensed by the Department of Health to perform surgical and related services or lithotripsy services, if the following conditions are met:

(a) the practitioner who provided the referral personally performs the procedure;

(b) the practitioner's remuneration as an owner of or investor in the practice or facility is directly proportional to the practitioner's ownership interest and not to the volume of patients the practitioner refers to the practice or facility;

(c) all clinically-related decisions at a facility owned in part by non-practitioners are made by practitioners and are in the best interests of the patient; and

(d) disclosure of the referring practitioner's significant beneficial interest in the practice or facility is made to the patient in writing, at or prior to the time that the referral is made, consistent with the provisions of section 3 of P.L. 1989, c. 19 (C.45:9-22.6).

57. Thus, if a physician self-referred patients for a medical procedure at an ambulatory care facility or registered surgical practice, the referrals would not qualify for the ASC Exception and therefore would violate the Codey Law unless – among other things – the physician who made the referral personally performed the resulting procedure, and the procedure actually required (or legitimately involved the use of) anesthesia.

58. Physicians, medical practices, and surgical practices in New Jersey that engage in self-referral arrangements that violate the Codey Law are not eligible to receive PIP Benefits.

59. Pursuant to N.J.S.A. 39:6A–4, an insurer such as Liberty Mutual is only required to pay PIP Benefits for reasonable, necessary, and appropriate treatment. At the same time, a health care services provider is only eligible to receive PIP Benefits for medically necessary services.

60. Like New York, New Jersey has established a medical fee schedule (the "NJ Fee Schedule") that is applicable to claims for PIP Benefits.

61. When a health care services provider submits a claim for PIP Benefits using the current procedural terminology ("CPT") codes set forth in the NJ Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

62. Additionally, subject to certain limited exceptions, ambulatory surgery centers in New Jersey – such as Stemmee – need to obtain an ambulatory care facility license from the New Jersey Department of Health ("NJDOH"). For instance, N.J.S.A. § 26:2H-12, part of the New Jersey Health Care Facilities Planning Act, specifies that "No … health care facility shall be

operated unless it shall: … possess a valid license issued pursuant to this act, which license shall specify the kind or kinds of health care services the facility is authorized to provide … ."

63. N.J.A.C. 8:43A sets various requirements regarding the licensure and operation of ambulatory care facilities in New Jersey. Among other things, N.J.A.C. 8:43A-7.2 – N.J.A.C. 8:43A-7.4 require every ambulatory care facility in New Jersey to have a qualified physician on staff as medical director to "be responsible for the direction, provision, and quality of medical services provided to patients", including "[d]eveloping and maintaining written objectives, policies, a procedure manual, an organizational plan, and a quality assurance program for the medical service", and "[e]nsur[ing] that medical staffing patterns are implemented".

64. Pursuant to N.J.A.C. 8:43A, every ambulatory care facility medical director also must develop, implement, and review "written medical policies, including medical staff bylaws, in cooperation with the medical staff."

65. The medical director, or another physician designated by the medical director in writing to act in the medical director's absence, also must be available to the ambulatory care facility "at all times".

66. In addition, the pertinent New Jersey ambulatory care facility licensing regulations require every ambulatory care facility in New Jersey to, among other things.

(i) develop and implement a written policy and procedure manual for the organization and operation of the facility, which must be periodically reviewed, with each review documented (see N.J.A.C. 8:43A-3.6);

(ii) have a patient care policy committee, which must include the medical director and the facility administrator, among others, and which must review all patient care policies at least triennially, and document the reviews (see N.J.A.C. 8:43A-6.2);

(iii) maintain written patient care policies and procedures, which must be maintained and available within the facility (see N.J.A.C. 8:43A-6.3);

(iv) develop and implement medical staff policies and medical staff bylaws, which must include – among other things – a plan for medical staff meetings and their documentation through minutes (see N.J.A.C. 8:43A-7.4);

(v) develop written policies and procedures regarding medical records, and designate an employee to act as the coordinator of medical records services, as well as another employee to act in the absence of the coordinator to ensure staff access to the medical record at all times during the hours of operation (see N.J.A.C. 8:43A-13.2, 13.5); and

(vi) have an infection control committee, which must include the medical director and an infection control professional, among others, and must develop, implement, and review, every three years or more frequently, as necessary, written policies and procedures regarding infection prevention and control (see N.J.A.C. 8:43A-14.2).

67. Ambulatory care facilities in New Jersey that fail to comply with these requirements, or the other significant licensing and regulatory requirements applicable to ambulatory care facilities, are not eligible to receive PIP Benefits.

## II. The Defendants' Fraudulent and Unlawful Scheme

68. Beginning no later than 2020, and continuing through the present day, the Defendants conceived and implemented a fraudulent scheme in which they caused a large amount of fraudulent and unlawful PIP billing to be submitted to Liberty Mutual for medically unnecessary, illusory, unlawful, and otherwise non-reimbursable services in New York and New Jersey.

### A. University Pain's Unlawful Operation in New York

69. As set forth above, University Pain is a New Jersey limited liability company, not a New York limited liability company.

70. As set forth above, pursuant to 11 N.Y.C.R.R. § 65-3.16(a)(12), health care services providers are not eligible to collect PIP Benefits if the providers fail "to meet any applicable New York State or local licensing requirement necessary to perform such service in New York …"

71. Pursuant to the New York Education Law, medical professional entities operating in New York, such as University Pain, must have a certificate of authority from the New York

Department of Education and must be properly incorporated in New York. See, e.g., N.Y. Educ. Law §§ 6509, 6530; N.Y. Bus. Corp. Law §§ 1503, 1514.

72. Nonetheless, University Pain never obtained a certificate of authority from the New York Education Department and was never properly incorporated or established in New York.

73. For instance, searches of the New York Department of State Division of Corporations website indicate that University Pain was never incorporated or established in New York and has never been authorized to do business in New York.

74. Likewise, searches of the New York Education Department's Office of the Professions website indicate that University Pain never received any certificate of authority from the Education Department.

75. Even so, Demesmin routinely and unlawfully operated University Pain as a professional medical practice in New York.

76. For example:

(i) On or about January 7, 2021, University Pain and Demesmin billed Liberty Mutual for an examination purportedly provided through University Pain to an Insured named "C" at 717 Front Street, Hempstead, New York, despite the fact that University Pain was ineligible to receive PIP Benefits in connection with the putative examination because it could not lawfully provide the service in New York.

(ii) On or about January 7, 2021, University Pain and Demesmin billed Liberty Mutual for an examination purportedly provided through University Pain to an Insured named "J" at 717 Front Street, Hempstead, New York, despite the fact that University Pain was ineligible to receive PIP Benefits in connection with the putative examination because it could not lawfully provide the service in New York.

(iii) On or about January 21, 2021, University Pain and Demesmin billed Liberty Mutual for an examination purportedly provided through University Pain to an Insured named "G" at 717 Front Street, Hempstead, New York, despite the fact that University Pain was ineligible to receive PIP Benefits in connection with the putative examination because it could not lawfully provide the service in New York.

(iv) On or about February 4, 2021, University Pain and Demesmin billed Liberty Mutual for an examination purportedly provided through University Pain to an Insured named "H" at 717 Front Street, Hempstead, New York, despite the fact that University Pain was ineligible to receive PIP Benefits in connection with the putative examination because it could not lawfully provide the service in New York.

(v) On or about February 10, 2021, University Pain and Demesmin billed Liberty Mutual for an examination purportedly provided through University Pain to an Insured named "J" at 717 Front Street, Hempstead, New York, despite the fact that University Pain was ineligible to receive PIP Benefits in connection with the putative examination because it could not lawfully provide the service in New York.

(vi) On or about February 24, 2021, University Pain and Demesmin billed Liberty Mutual for an examination purportedly provided through University Pain to an Insured named "Y" at 717 Front Street, Hempstead, New York, despite the fact that University Pain was ineligible to receive PIP Benefits in connection with the putative examination because it could not lawfully provide the service in New York.

(vii) On or about April 1, 2021, University Pain and Demesmin billed Liberty Mutual for an examination purportedly provided through University Pain to an Insured named "P" at 717 Front Street, Hempstead, New York, despite the fact that University Pain was ineligible to receive PIP Benefits in connection with the putative examination because it could not lawfully provide the service in New York.

(viii) On or about January 10, 2022, University Pain and Demesmin billed Liberty Mutual for an examination purportedly provided through University Pain to an Insured named "L" at 110 Duane Street, New York, New York, despite the fact that University Pain was ineligible to receive PIP Benefits in connection with the putative examination because it could not lawfully provide the service in New York.

(ix) On or about March 31, 2022, University Pain and Demesmin billed Liberty Mutual for an examination purportedly provided through University Pain to an Insured named "D" at 110 Duane Street, New York, New York, despite the fact that University Pain was ineligible to receive PIP Benefits in connection with the putative examination because it could not lawfully provide the service in New York.

(x) On May 16, 2022, University Pain and Demesmin billed Liberty Mutual for an examination purportedly provided through University Pain to an Insured named "J" at 110 Duane Street, New York, New York, despite the fact that University Pain

was ineligible to receive PIP Benefits in connection with the putative examination because it could not lawfully provide the service in New York.

77. These are only representative examples. All of the claims for Fraudulent Services identified in Exhibit "2" for services that purportedly were provided in New York were provided in violation of New York licensing laws, because University Pain lacked the authority to operate as a medical practice in New York.

**B. NY Pain's Unlawful Operations in New Jersey**

78. As set forth above, a foreign limited liability company may not lawfully operate as a medical practice in New Jersey.

79. As discussed above, NY Pain was a New York professional limited liability company. NY Pain was not and has never been a New Jersey limited liability company. Further, NY Pain was never established as a limited liability company under New Jersey law.

80. Accordingly, NY Pain could not lawfully provide medical or other professional services in the state of New Jersey.

81. Even so, in the claims identified in Exhibit "1", Demesmin routinely caused NY Pain to unlawfully provide purported medical services in New Jersey, which then were billed to Liberty Mutual.

82. For example:

(i) On or about October 7, 2021, NY Pain and Demesmin billed Liberty Mutual for an examination purportedly provided through NY Pain to an Insured named "N" at 59 Veronica Ave, Somerset, New Jersey, despite the fact that NY Pain was ineligible to receive PIP Benefits in connection with the examination, because it could not lawfully provide the service in New Jersey.

(ii) On or about October 21, 2021, NY Pain and Demesmin billed Liberty Mutual for an examination purportedly provided through NY Pain to an Insured named "A" at 59 Veronica Ave, Somerset, New Jersey, despite the fact that NY Pain was ineligible to receive PIP Benefits in connection with the examination, because it could not lawfully provide the service in New Jersey.

(iii) On or about November 16, 2021, NY Pain and Demesmin billed Liberty Mutual for an examination purportedly provided through NY Pain to an Insured named "J" at 59 Veronica Ave, Somerset, New Jersey, despite the fact that NY Pain was ineligible to receive PIP Benefits in connection with the examination, because it could not lawfully provide the service in New Jersey.

(iv) On or about November 16, 2021, NY Pain and Demesmin billed Liberty Mutual for an examination purportedly provided through NY Pain to an Insured named "N" at 59 Veronica Ave, Somerset, New Jersey, despite the fact that NY Pain was ineligible to receive PIP Benefits in connection with the examination, because it could not lawfully provide the service in New Jersey.

(v) On or about December 11, 2021, NY Pain and Demesmin billed Liberty Mutual for an examination purportedly provided through NY Pain to an Insured named "S" at 59 Veronica Ave, Somerset, New Jersey, despite the fact that NY Pain was ineligible to receive PIP Benefits in connection with the examination, because it could not lawfully provide the service in New Jersey.

(vi) On or about December 14, 2021, NY Pain and Demesmin billed Liberty Mutual for an examination purportedly provided through NY Pain to an Insured named "M" at 59 Veronica Ave, Somerset, New Jersey, despite the fact that NY Pain was ineligible to receive PIP Benefits in connection with the examination, because it could not lawfully provide the service in New Jersey.

(vii) On or about December 14, 2021, NY Pain and Demesmin billed Liberty Mutual for an examination purportedly provided through NY Pain to an Insured named "G" at 59 Veronica Ave, Somerset, New Jersey, despite the fact that NY Pain was ineligible to receive PIP Benefits in connection with the examination, because it could not lawfully provide the service in New Jersey.

(viii) On or about December 16, 2021, NY Pain and Demesmin billed Liberty Mutual for an examination purportedly provided through NY Pain to an Insured named "J" at 59 Veronica Ave, Somerset, New Jersey, despite the fact that NY Pain was ineligible to receive PIP Benefits in connection with the examination, because it could not lawfully provide the service in New Jersey.

(ix) On or about June 15, 2022, NY Pain and Demesmin billed Liberty Mutual for an examination purportedly provided through NY Pain to an Insured named "B" at 59 Veronica Ave, Somerset, New Jersey, despite the fact that NY Pain was ineligible to receive PIP Benefits in connection with the examination, because it could not lawfully provide the service in New Jersey.

(x) On or about June 15, 2022, NY Pain and Demesmin billed Liberty Mutual for an examination purportedly provided through NY Pain to an Insured named "J" at 59 Veronica Ave, Somerset, New Jersey, despite the fact that NY Pain was ineligible

to receive PIP Benefits in connection with the examination, because it could not lawfully provide the service in New Jersey.

83. These are only representative examples. Many of the claims for Fraudulent Services identified in Exhibit "1" for services that purportedly were provided in New Jersey were provided in violation of New Jersey law, because NY Pain lacked the ability to lawfully operate as a medical practice in New Jersey.

**C. The Payment and Receipt of Unlawful Compensation by the Defendants in Exchange for Patient Referrals**

84. In order to bill Liberty Mutual and other automobile insurers for initial examinations, follow up examinations, surgical procedures, pain management injections, EDX testing, and other services, University Pain, NY Pain, and Demesmin needed to obtain patient referrals from other health care providers.

85. However, University Pain, NY Pain, and Demesmin did not advertise or market University Pain or NY Pain's services to the general public, did not maintain a consistent schedule at any one location, were not the owners of or the leaseholders of the real property from which they purported to provide many of the Fraudulent Services, and did not engage in any legitimate efforts to build a reputation or goodwill among legitimate referral sources.

86. Accordingly, in an effort to obtain access to a large number of no-fault insurance patients, University Pain, NY Pain, Demesmin, or some other health care provider acting on their behalf and at their direction, would regularly operate on a transient basis from a large number of multidisciplinary clinics located throughout New York and New Jersey (the "No-Fault Clinics") that purported to provide treatment to patients with no-fault insurance, including but not limited to No-Fault Clinics at the following locations.

(i) 1220 East New York Avenue, Brooklyn, New York, 11212
(ii) 215-19 39th Avenue, Flushing, New York, 11361

(iii) 31 Guy Lombardo Avenue, Freeport, New York, 11520
(iv) 40-11 Warren Street, Flushing, New York, 11373
(v) 55 2nd Avenue, Unit 1, Brentwood, New York, 11717
(vi) 679 Montgomery Street, Jersey City, New Jersey
(vii) 717 Front Street, Hempstead, New York, 11550
(viii) 823 56th Street, Brooklyn, New York, 11220
(ix) 90-46 Corona Avenue, Elmhurst, New York, 11373
(x) 92-08 Liberty Avenue, Jamaica, New York, 11417

87. Though ostensibly organized to provide a range of health care services to Insureds at individual locations, these No-Fault Clinics in actuality were organized to supply convenient, one-stop shops for no-fault insurance fraud.

88. These No-Fault Clinics provided facilities for University Pain, NY Pain, and Demesmin, as well as a "revolving door" of medical professional corporations, chiropractic professional corporations, physical therapy professional corporations and other purported health care providers, all geared towards exploiting New York's no-fault insurance system.

89. University Pain, NY Pain, and Demesmin gained access to the No-Fault Clinics by paying unlawful compensation, in exchange for patient referrals, to other health care services providers (the "Referring Providers") who operated from the No-Fault Clinics and controlled access to the No-Fault Clinics.

90. The unlawful compensation was paid in the form of untraceable cash, or else was disguised as ostensibly legitimate fees to "lease" space or personnel at the No-Fault Clinics. In fact, these were "pay-to-play" arrangements that caused the Referring Providers at the No-Fault Clinics to provide access to Insureds and to refer the Insureds to University Pain, NY Pain, and Demesmin for the Fraudulent Services without regard for the medical necessity of any of the Fraudulent Services.

91. The unlawful compensation also was paid in the form of return referrals from University Pain, NY Pain, and Demesmin to the Referring Providers for the continued provision of their own medically unwarranted services.

92. In this context, to the extent that the Insureds in the claims set forth in Exhibits "1" and "2" suffered any injuries at all in their automobile accidents, they almost always were minor soft tissue injuries such as sprains or strains.

93. Because ordinary soft tissue injuries such as sprains or strains almost always resolve after a short course of conservative treatment, or no treatment at all, the Referring Providers knew that their ability to submit and obtain payment on large amounts of chiropractic, physical therapy, acupuncture, and related billing to Liberty Mutual and other automobile insurers would be limited, inasmuch as they would not be able to demonstrate that the Insureds required additional chiropractic, physical therapy, acupuncture, and/or related services beyond an initial short course of conservative treatment.

94. The Referring Providers also knew that it would be much easier for them to obtain payment on large amounts of PIP insurance billing for medically unnecessary chiropractic, physical therapy, acupuncture, and related services if a licensed physician or physicians were to generate reports and diagnoses that purported to reflect injuries more serious than ordinary strains and sprains.

95. Accordingly, the Referring Providers entered into secret agreements with University Pain, NY Pain, and Demesmin, whereby the Referring Providers agreed to refer Insureds to University Pain and NY Pain for expensive and medically unnecessary examinations and pain management injections, despite the Insureds' lack of any genuine presenting problems that would warrant the examinations or the injections.

96. Then, as additional compensation for these medically unnecessary referrals, University Pain, NY Pain, and Demesmin would falsely report that the Insureds suffered from serious, continuing symptoms as the result of their accidents, and then refer the Insureds back to the Referring Providers for continued medically unnecessary treatment.

97. In reality, these were "pay–to–play" arrangements that caused the No-Fault Clinics to provide access to Insureds and to refer Insureds to University Pain and NY Pain for medically unnecessary examinations, EDX testing, pain-management injections, and/or surgical procedures.

98. In keeping with the fact that their ostensibly legitimate "rent" payments actually were disguised kickbacks in exchange for patient referrals, University Pain, NY Pain, and Demesmin operated from the respective No-Fault Clinics on only a sporadic basis, on different days each month, only when the No-Fault Clinics had patients to refer to University Pain and NY Pain pursuant to the unlawful referral scheme.

99. In further keeping with the fact that the putative "rent" payments were not for fixed fees set in advance, and did not cover any regular lease terms, none of the No-Fault Clinics displayed external signage or other indicia of University Pain, NY Pain, and Demesmin's ongoing presence at the offices.

100. In addition to the phony "lease" payments, University Pain, NY Pain, and Demesmin's false contentions that Insureds continued to suffer from significant levels of pain, functional deficits, and radiculopathies as the result of their minor automobile accidents, and return referrals of the Insureds by University Pain, NY Pain, and Demesmin back to the No-Fault Clinics, constituted unlawful compensation the No-Fault Clinics for their initial referrals of Insureds to University Pain, NY Pain, and Demesmin, as these contentions, diagnoses, and referrals provided

a false justification for the No-Fault Clinics to continue to provide medically unnecessary physical therapy, EDX testing, and related services to the Insureds.

101. In keeping with the fact that University Pain, NY Pain, and Demesmin's return referrals were not predicated on medical necessity, and in fact constituted unlawful compensation to the No-Fault Clinics for the initial referrals of the Insureds, the Defendants' own records often indicated that the prior physical therapy, EDX testing, and/or related services provided through the No-Fault Clinics had not been effective in resolving the Insureds' supposed complaints.

102. For example:

(i) On May 17, 2020, an Insured named "H" was involved in an automobile accident. The contemporaneous police report indicated that "H" had complaints of pain at the scene, and was transported to Virtua Memorial Hospital Emergency Department. The contemporaneous hospital records indicated that "H" was briefly observed on an outpatient basis and released shortly thereafter with no serious injury diagnosis. To the extent that "H" experienced any health problems at all as the result of the accident, they were of minimal severity at the outset, and improved over time. Thereafter, "H" sought treatment from a No-Fault Clinic located at 823 56th Street, Brooklyn, New York, which provided physical therapy treatment to "H" between May 2020 and December 2020. In August 2020, a Referring Provider at the No-Fault Clinic caused "H" to be referred to University Pain in exchange for unlawful compensation from University Pain and Demesmin. Thereafter, on August 6, 2020, Demesmin purported to examine "H" on behalf of University Pain at the No-Fault Clinic. In the August 6, 2020, examination report, Demesmin falsely contended that "H" continued to suffer from high levels of pain as the result of the accident, despite the fact that – by that point – "H" had received nearly three months of physical therapy services from the Referring Provider. Though the physical therapy treatment that Referring Provider purportedly had provided supposedly had been ineffective in resolving "H"'s putative symptoms, Demesmin nonetheless referred "H" back to Referring Provider for continued physical therapy treatment at the conclusion of the August 6, 2020, examination – nearly three months after the accident, and long after any legitimate symptoms "H" may have experienced had resolved. The medically unnecessary return referral was part of a scheme through which Insureds were referred for medically unnecessary services.

(ii) On October 22, 2020, an Insured named "C" was involved in an automobile accident. The contemporaneous police report indicated that "C"'s vehicle was drivable following the accident. The police report further indicated that "C" was not injured as a result of the accident. In keeping with the fact that "C" was not seriously injured, "C" did not visit any hospital emergency room following the

accident. To the extent that "C" experienced any health problems at all as the result of the accident, they were of minimal severity at the outset, and improved over time. Thereafter, "C" sought treatment from a No-Fault Clinic located at 717 Front Street, Hempstead, New York, which provided physical therapy treatment to "C" between November 2020 and July 2021. In January 2021, a Referring Provider at the No-Fault Clinic caused "C" to be referred to University Pain in exchange for unlawful compensation from University Pain and Demesmin. Thereafter, on January 7, 2021, Demesmin purported to examine "C" on behalf of University Pain at the No-Fault Clinic. In the January 7, 2021, examination report, Demesmin falsely contended that "C" continued to suffer from high levels of pain as the result of the accident, despite the fact that – by that point – "C" had received over two months of physical therapy services from the Referring Provider. Though the physical therapy treatment that Referring Provider purportedly had provided supposedly had been ineffective in resolving "C"'s putative symptoms, Demesmin nonetheless referred "C" back to Referring Provider for continued physical therapy and chiropractic treatment at the conclusion of the January 7, 2021, examination – over two months after the accident, and long after any legitimate symptoms "C" may have experienced had resolved. The medically unnecessary return referral was part of a scheme through which Insureds were referred for medically unnecessary services.

(iii) On October 22, 2020, an Insured named "G" was involved in an automobile accident. The contemporaneous police report indicated that "G"'s vehicle was drivable following the accident. The police report further indicated that "G" was not injured as a result of the accident. In keeping with the fact that "G" was not seriously injured, "G" did not visit any hospital emergency room following the accident. To the extent that "G" experienced any health problems at all as the result of the accident, they were of minimal severity at the outset, and improved over time. Thereafter, "G" sought treatment from a No-Fault Clinic located at 717 Front Street, Hempstead, New York, which provided physical therapy and chiropractic treatment to "G" between October 2020 and July 2021. In January 2021, a Referring Provider at the No-Fault Clinic caused "G" to be referred to University Pain in exchange for unlawful compensation from University Pain and Demesmin. Thereafter, on January 7, 2021, Demesmin purported to examine "G" on behalf of University Pain at the No-Fault Clinic. In the January 7, 2021, examination report, Demesmin falsely contended that "G" continued to suffer from high levels of pain as the result of the accident, despite the fact that – by that point – "G" had received over two months of physical therapy services from the Referring Provider. Though the physical therapy and chiropractic treatment that Referring Provider purportedly had provided supposedly had been ineffective in resolving "G"'s putative symptoms, Demesmin nonetheless referred "G" back to Referring Provider for continued physical therapy and chiropractic treatment at the conclusion of the January 7, 2021, examination – over two months after the accident, and long after any legitimate symptoms "G" may have experienced had resolved. The medically unnecessary return referral was part of a scheme through which Insureds were referred for medically unnecessary services.

(iv) On January 23, 2021, an Insured named "V" was involved in an automobile accident. The contemporaneous police report indicated that "V" was not injured as a result of the accident. In keeping with the fact that "V" was not seriously injured, "V" did not visit any hospital emergency room following the accident. To the extent that "V" experienced any health problems at all as the result of the accident, they were of minimal severity at the outset, and improved over time. Thereafter, "V" sought treatment from a No-Fault Clinic located at 55 2nd Ave, Brentwood, New York, which provided chiropractic treatment to "V" between January 2021 and June 2022. In June 2021, a Referring Provider at the No-Fault Clinic caused "V" to be referred to NY Pain in exchange for unlawful compensation from NY Pain and Demesmin. Thereafter, on June 21, 2021, Fady Wassef, M.D. ("Wassef") purported to examine "V" on behalf of NY Pain at the No-Fault Clinic. In the June 21, 2021, examination report, Wassef falsely contended that "V" continued to suffer from high levels of pain as the result of the accident, despite the fact that – by that point – "V" had received nearly six months of physical therapy and chiropractic services from the Referring Provider. Though the physical therapy and chiropractic treatment that Referring Provider purportedly had provided supposedly had been ineffective in resolving "V"'s putative symptoms, Wassef nonetheless referred "V" back to Referring Provider for continued physical therapy and chiropractic treatment at the conclusion of the June 21, 2021, examination – nearly six months after the accident, and long after any legitimate symptoms "V" may have experienced had resolved. The medically unnecessary return referral was part of a scheme through which Insureds were referred for medically unnecessary services.

(v) On June 20, 2021, an Insured named "N" was involved in an automobile accident. The contemporaneous police report indicated that "N" had complaints of pain at the scene, and was transported to Mercy Medical Center Emergency Department. The contemporaneous hospital records indicated that "N" was briefly observed on an outpatient basis and released shortly thereafter with no serious injury diagnosis. To the extent that "N" experienced any health problems at all as the result of the accident, they were of minimal severity at the outset, and improved over time. Thereafter, "N" sought treatment from a No-Fault Clinic located at 717 Front Street, Hempstead, New York, which provided physical therapy and chiropractic treatment to "N" between July 2021 and February 2022. In October 2021, a Referring Provider at the No-Fault Clinic caused "N" to be referred to NY Pain in exchange for unlawful compensation from NY Pain and Demesmin. Thereafter, on October 7, 2021, Demesmin purported to examine "N" on behalf of NY Pain at the No-Fault Clinic. In the October 7, 2021, examination report, Demesmin falsely contended that "N" continued to suffer from high levels of pain as the result of the accident, despite the fact that – by that point – "N" had received over three months of physical therapy and chiropractic services from the Referring Provider. Though the physical therapy and chiropractic treatment that Referring Provider purportedly had provided supposedly had been ineffective in resolving "N"'s putative symptoms, Demesmin nonetheless referred "N" back to Referring Provider for continued physical therapy and chiropractic treatment at the conclusion of the October 7, 2021, examination – over three months after the accident, and long after

any legitimate symptoms "N" may have experienced had resolved. The medically unnecessary return referral was part of a scheme through which Insureds were referred for medically unnecessary services.

(vi) On November 20, 2021, an Insured named "V" was involved in an automobile accident. The contemporaneous police report indicated that "V" had complaints of pain at the scene, and was transported to NSLIJ Hospital Emergency Department. The contemporaneous hospital records indicated that "V" was briefly observed on an outpatient basis and released shortly thereafter with no serious injury diagnosis. To the extent that "V" experienced any health problems at all as the result of the accident, they were of minimal severity at the outset, and improved over time. Thereafter, "V" sought treatment from a No-Fault Clinic located at 717 Front Street, Hempstead, New York, which provided chiropractic treatment to "V" between November 2021 and May 2022. In February 2022, a Referring Provider at the No-Fault Clinic caused "V" to be referred to NY Pain in exchange for unlawful compensation from NY Pain and Demesmin. Thereafter, on February 3, 2022, Demesmin purported to examine "V" on behalf of NY Pain at the No-Fault Clinic. In the February 3, 2022, examination report, Demesmin falsely contended that "V" continued to suffer from high levels of pain as the result of the accident, despite the fact that – by that point – "V" had received over two months of chiropractic services from the Referring Provider. Though the chiropractic treatment that Referring Provider purportedly had provided supposedly had been ineffective in resolving "V"'s putative symptoms, Demesmin nonetheless referred "V" back to Referring Provider for continued chiropractic treatment at the conclusion of the February 3, 2022, examination – over two months after the accident, and long after any legitimate symptoms "V" may have experienced had resolved. The medically unnecessary return referral was part of a scheme through which Insureds were referred for medically unnecessary services.

(vii) On January 23, 2022, an Insured named "W" was involved in an automobile accident. The contemporaneous police report indicated that "W"'s vehicle was drivable following the accident. The police report further indicated that "W" was not injured as a result of the accident. In keeping with the fact that "W" was not seriously injured, "W" did not visit any hospital emergency room following the accident. To the extent that "W" experienced any health problems at all as the result of the accident, they were of minimal severity at the outset, and improved over time. Thereafter, "W" sought treatment from a No-Fault Clinic located at 40-11 Warren Street, Flushing, New York, which provided chiropractic treatment to "W" between February 2022 and July 2022. In June 2022, a Referring Provider at the No-Fault Clinic caused "W" to be referred to NY Pain in exchange for unlawful compensation from NY Pain and Demesmin. Thereafter, on June 1, 2022, Wassef purported to examine "W" on behalf of NY Pain at the No-Fault Clinic. In the June 1, 2022, examination report, Wassef falsely contended that "W" continued to suffer from high levels of pain as the result of the accident, despite the fact that – by that point – "W" had received nearly six months of chiropractic services from the Referring Provider. Though the chiropractic treatment that Referring Provider

purportedly had provided supposedly had been ineffective in resolving "W"'s putative symptoms, Wassef nonetheless referred "W" back to Referring Provider for continued chiropractic treatment at the conclusion of the June 1, 2022, examination – nearly six months after the accident, and long after any legitimate symptoms "W" may have experienced had resolved. The medically unnecessary return referral was part of a scheme through which Insureds were referred for medically unnecessary services.

(viii) On September 8, 2022, an Insured named "P" was involved in an automobile accident. The contemporaneous police report indicated that "P"'s vehicle was drivable following the accident. The police report further indicated that "P" was not injured as a result of the accident. In keeping with the fact that "P" was not seriously injured, "P" did not visit any hospital emergency room following the accident. To the extent that "P" experienced any health problems at all as the result of the accident, they were of minimal severity at the outset, and improved over time. Thereafter, "P" sought treatment from a No-Fault Clinic located at 55 2nd Ave, Brentwood, New York, which provided chiropractic treatment to "P" between September 2022 and July 2023. In March 2023, a Referring Provider at the No-Fault Clinic caused "P" to be referred to NY Pain in exchange for unlawful compensation from NY Pain and Demesmin. Thereafter, on March 27, 2023, Wassef purported to examine "P" on behalf of NY Pain at the No-Fault Clinic. In the March 27, 2023, examination report, Wassef falsely contended that "P" continued to suffer from high levels of pain as the result of the accident, despite the fact that – by that point – "P" had received nearly six months of chiropractic services from the Referring Provider. Though the chiropractic treatment that Referring Provider purportedly had provided supposedly had been ineffective in resolving "P"'s putative symptoms, Wassef nonetheless referred "P" back to Referring Provider for continued chiropractic treatment at the conclusion of the March 27, 2023, examination – nearly six months after the accident, and long after any legitimate symptoms "P" may have experienced had resolved. The medically unnecessary return referral was part of a scheme through which Insureds were referred for medically unnecessary services.

(ix) On October 31, 2022, an Insured named "G" was involved in an automobile accident. The contemporaneous police report indicated that "G"'s vehicle was drivable following the accident. The police report further indicated that "G" was not injured as a result of the accident. In keeping with the fact that "G" was not seriously injured, "G" did not visit any hospital emergency room following the accident. To the extent that "G" experienced any health problems at all as the result of the accident, they were of minimal severity at the outset, and improved over time. Thereafter, "G" sought treatment from a No-Fault Clinic located at 717 Front Street, Hempstead, New York, which provided chiropractic treatment to "G" between November 2022 and April 2023. In March 2023, a Referring Provider at the No-Fault Clinic caused "G" to be referred to NY Pain in exchange for unlawful compensation from NY Pain and Demesmin. Thereafter, on March 2, 2023, Demesmin purported to examine "G" on behalf of NY Pain at the No-Fault Clinic.

In the March 2, 2023, examination report, Demesmin falsely contended that “G” continued to suffer from high levels of pain as the result of the accident, despite the fact that – by that point – “G” had received nearly five months of chiropractic services from the Referring Provider. Though the chiropractic treatment that Referring Provider purportedly had provided supposedly had been ineffective in resolving “G”’s putative symptoms, Demesmin nonetheless referred “G” back to Referring Provider for continued chiropractic treatment at the conclusion of the March 2, 2023, examination – over five months after the accident, and long after any legitimate symptoms “G” may have experienced had resolved. The medically unnecessary return referral was part of a scheme through which Insureds were referred for medically unnecessary services.

(x) On May 9, 2025, an Insured named “J” was involved in an automobile accident. Pursuant to statements provided by “J”, police were not called to the scene of the accident. Following the accident, “J” was not transported to any hospital emergency department. To the extent that “J” experienced any health problems at all as the result of the accident, they were of minimal severity at the outset, and improved over time. Thereafter, “J” sought treatment from a No-Fault Clinic located at 717 Front Street, Hempstead, New York, which provided physical therapy and chiropractic treatment to “J” between May 2025 and August 2025. In July 2025, a Referring Provider at the No-Fault Clinic caused “J” to be referred to NY Pain in exchange for unlawful compensation from NY Pain and Demesmin. Thereafter, on July 24, 2025, Demesmin purported to examine “J” on behalf of NY Pain at the No-Fault Clinic. In the July 24, 2025, examination report, Demesmin falsely contended that “J” continued to suffer from high levels of pain as the result of the accident, despite the fact that – by that point – “J” had received over two months of physical therapy and chiropractic services from the Referring Provider. Though the physical therapy and chiropractic treatment that Referring Provider purportedly had provided supposedly had been ineffective in resolving “J”’s putative symptoms, Demesmin nonetheless referred “J” back to Referring Provider for continued physical therapy treatment at the conclusion of the July 24, 2025, examination – over two months after the accident, and long after any legitimate symptoms “J” may have experienced had resolved. The medically unnecessary return referral was part of a scheme through which Insureds were referred for medically unnecessary services.

103. These are only representative examples. In the claims identified in Exhibits “1” and “2”, the Defendants routinely and unlawfully paid and received unlawful compensation in exchange for patient referrals for medically unnecessary services.

**D. The Fraudulent Charges for Initial Examinations at University Pain and NY Pain**

104. Upon receiving a referral pursuant to the unlawful compensation in exchange for patient referrals that NY Pain, University Pain, and Demesmin paid to the Referring Providers at the No-Fault Clinics, NY Pain, University Pain, and Demesmin purported to provide virtually every Insured in the claims identified in Exhibits "1" – "2" with an initial examination.

105. In the claims set forth in Exhibit "1", Demesmin purported to perform many of the putative initial examinations on behalf of NY Pain, which were then billed through NY Pain to Liberty Mutual under CPT codes 99203 or 99204, typically resulting in a charge of between $121.39 and $1,050.00 for each purported initial examination.

106. In the claims set forth in Exhibit "2", Demesmin purported to perform the majority of the putative initial examinations on behalf of University Pain, which were then billed through University Pain to Liberty Mutual under CPT codes 99203 or 99204, typically resulting in a charge of between $142.62 and $203.76 for each purported initial examination.

107. Pursuant to the American Medical Association's CPT Assistant, which governs the use of CPT codes used in no-fault billing, at all relevant times the use of CPT code 99203 to bill for an initial patient examination represented – among other things – that: (a) the patient presented with problems of moderate severity; (b) the physician or other practitioner who performed the examination spent at least 30 minutes of time performing the examination; and (c) the physician or other practitioner who performed the examination engaged in legitimate "low complexity" medical decision-making in connection with the examination.

108. Moreover, pursuant to the CPT Assistant, at all relevant times the use of CPT code 99204 to bill for an initial patient examination represented – among other things – that: (a) the patient presented with problems of moderate to high severity; (b) the physician or other practitioner

who performed the examination spent at least 45 minutes of time performing the examination; and (c) the physician or other practitioner who performed the examination engaged in legitimate "moderate complexity" medical decision-making in connection with the examination.

109. In the claims for initial examinations identified in Exhibits "1" – "2", the charges for the initial examinations were fraudulent in that they misrepresented NY Pain, University Pain, and Demesmin's eligibility to collect PIP Benefits in the first instance.

110. In fact, NY Pain, University Pain, and Demesmin, were not eligible to collect PIP Benefits in the claims for initial examinations that are identified in Exhibits "1" – "2", because – as a result of the fraudulent scheme described herein – neither NY Pain, University Pain, and Demesmin, nor the examinations were in compliance with all significant laws and regulations or licensing laws governing health care practice.

111. Moreover, and as set forth below, the charges for the initial examinations also were fraudulent in that they misrepresented the extent, nature, and results of the initial examinations.

**a. Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

112. The CPT Assistant provides various clinical examples of moderate severity presenting problems that would support the use of CPT code 99203 to bill for an initial patient examination, namely:

(i) Office visit for initial evaluation of a 48-year-old man with recurrent low back pain radiating to the leg. (General Surgery)

(ii) Initial office evaluation of a 49-year-old male with nasal obstruction. Detailed exam with topical anesthesia. (Plastic Surgery)

(iii) Initial office evaluation for diagnosis and management of painless gross hematuria in new patient, without cystoscopy. (Internal Medicine)

(iv) Initial office visit for evaluation of a 13-year-old female with progressive scoliosis. (Physical Medicine and Rehabilitation)

(v) Initial office visit with couple for counseling concerning voluntary vasectomy for sterility. Spent 30 minutes discussing procedure, risks and benefits, and answering questions. (Urology)

113. Accordingly, pursuant to the CPT Assistant, the moderate severity presenting problems that could support the use of CPT code 99203 to bill for an initial patient examination typically are either chronic and relatively serious problems, acute problems requiring immediate invasive treatment, or issues that legitimately require physician counseling.

114. Similarly, the CPT Assistant provides the following clinical examples of moderate to high severity presenting problems that would support the use of CPT code 99204 to bill for an initial patient examination:

(i) Office visit for initial evaluation of a 63-year-old male with chest pain on exertion. (Cardiology/Internal Medicine)

(ii) Initial office visit of a 50-year-old female with progressive solid food dysphagia. (Gastroenterology)

(iii) Initial office evaluation of a 70-year-old patient with recent onset of episodic confusion. (Internal Medicine)

(iv) Initial office visit for a 34-year-old patient with primary infertility, including counseling. (Obstetrics/Gynecology)

(v) Initial office visit for a 7-year-old female with juvenile diabetes mellitus, new to area, past history of hospitalization times three. (Pediatrics)

(vi) Initial office evaluation of a 70-year-old female with polyarthralgia. (Rheumatology)

(vii) Initial office evaluation of a 50-year-old male with an aortic aneurysm with respect to recommendation for surgery. (Thoracic Surgery)

115. Accordingly, pursuant to the CPT Assistant, the moderate to high severity presenting problems that could support the use of CPT code 99204 to bill for an initial patient examination typically are problems that pose a serious threat to the patient’s health, or even the patient’s life.

116. By contrast, to the extent that the Insureds in the claims identified in Exhibits “1” – “2” had any presenting problems at all as the result of their typically-minor automobile accidents, the problems almost always were minimal severity soft tissue injuries such as sprains and strains.

117. For instance, in most of the claims identified in Exhibits “1” – “2” the Insureds did not seek treatment at any hospital as the result of their accidents. To the limited extent that the Insureds in the claims identified in Exhibits “1” – “2” did seek treatment at a hospital following their accidents, they almost always were briefly observed on an outpatient basis, and discharged with nothing more serious than a minor soft tissue injury diagnosis.

118. Furthermore, in most of the claims identified in Exhibits “1” – “2”, contemporaneous police reports indicated that the Insureds’ vehicles were drivable following the accidents, and that no one was seriously injured in the accidents, or injured at all.

119. Even so, in the claims for initial examinations identified in Exhibits “1” – “2”, NY Pain, University Pain, and Demesmin billed Liberty Mutual for the putative initial examinations using CPT codes 99203 and 99204, and thereby falsely represented that the Insureds presented with problems of moderate or moderate to high severity. In fact, the Insureds’ problems were minimal severity soft tissue injuries such as sprains and strains, to the extent that they had any presenting problems as the result of any automobile accidents at all at the time of the purported examinations.

120. For example:

(i) On May 17, 2020, an Insured named “H” was involved in an automobile accident. The contemporaneous police report indicated that “H” had complaints of pain at the scene, and was transported to Virtua Memorial Hospital Emergency Department. The contemporaneous hospital records indicated that “H” was briefly observed on an outpatient basis and released shortly thereafter with no serious injury diagnosis. To the extent that “H” experienced any health problems at all as the result of the accident, they were of minimal severity at the outset, and improved over time. Even so, following a purported initial examination of “H” on June 11,

2020, Demesmin and University Pain billed Liberty Mutual for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(ii) On January 23, 2021, an Insured named "V" was involved in an automobile accident. The contemporaneous police report indicated that "V" was not injured as a result of the accident. In keeping with the fact that "V" was not seriously injured, "V" did not visit any hospital emergency room following the accident. To the extent that "V" experienced any health problems at all as the result of the accident, they were of minimal severity at the outset, and improved over time. Even so, following a purported initial examination of "V" on April 26, 2021, Demesmin and University Pain billed Liberty Mutual for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(iii) On April 15, 2021, an Insured named "K" was involved in an automobile accident. The contemporaneous police report indicated that "K" had complaints of pain at the scene, and was transported to RWJ University Hospital Emergency Department. The contemporaneous hospital records indicated that "K" was briefly observed on an outpatient basis and released shortly thereafter with no serious injury diagnosis. To the extent that "K" experienced any health problems at all as the result of the accident, they were of minimal severity at the outset, and improved over time. Even so, following a purported initial examination of "K" on May 10, 2021, Demesmin and University Pain billed Liberty Mutual for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(iv) On June 17, 2021, an Insured named "S" was involved in an automobile accident. The contemporaneous police report indicated that "S"'s vehicle was drivable following the accident. The police report further indicated that "S" was not injured as a result of the accident. In keeping with the fact that "S" was not seriously injured, "S" did not visit any hospital emergency room following the accident. To the extent that "S" experienced any health problems at all as the result of the accident, they were of minimal severity at the outset, and improved over time. Even so, following a purported initial examination of "S" on September 2, 2021, Demesmin and NY Pain billed Liberty Mutual for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(v) On August 7, 2021, an Insured named "E" was involved in an automobile accident. The contemporaneous police report indicated that "E"'s vehicle was drivable following the accident. The police report further indicated that "E" was not injured as a result of the accident. In keeping with the fact that "E" was not seriously injured, "E" did not visit any hospital emergency room following the accident. To the extent that "E" experienced any health problems at all as the result of the accident, they were of minimal severity at the outset, and improved over time. Even

so, following a purported initial examination of "E" on August 25, 2021, Demesmin and NY Pain billed Liberty Mutual for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(vi) On November 20, 2021, an Insured named "V" was involved in an automobile accident. The contemporaneous police report indicated that "V" had complaints of pain at the scene, and was transported to NSLIJ Hospital Emergency Department. The contemporaneous hospital records indicated that "V" was briefly observed on an outpatient basis and released shortly thereafter with no serious injury diagnosis. To the extent that "V" experienced any health problems at all as the result of the accident, they were of minimal severity at the outset, and improved over time. Even so, following a purported initial examination of "V" on February 3, 2022, Demesmin and NY Pain billed Liberty Mutual for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(vii) On March 15, 2022, an Insured named "T" was involved in an automobile accident. The contemporaneous police report indicated that "T"'s vehicle was drivable following the accident. The police report further indicated that "T" was not injured as a result of the accident. In keeping with the fact that "T" was not seriously injured, "T" did not visit any hospital emergency room following the accident. To the extent that "T" experienced any health problems at all as the result of the accident, they were of minimal severity at the outset, and improved over time. Even so, following a purported initial examination of "T" on June 13, 2022, Demesmin and University Pain billed Liberty Mutual for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(viii) On October 31, 2022, an Insured named "G" was involved in an automobile accident. The contemporaneous police report indicated that "G"'s vehicle was drivable following the accident. The police report further indicated that "G" was not injured as a result of the accident. In keeping with the fact that "G" was not seriously injured, "G" did not visit any hospital emergency room following the accident. To the extent that "G" experienced any health problems at all as the result of the accident, they were of minimal severity at the outset, and improved over time. Even so, following a purported initial examination of "G" on March 2, 2023, Demesmin and NY Pain billed Liberty Mutual for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(ix) On October 10, 2023, an Insured named "J" was involved in an automobile accident. The contemporaneous police report indicated that "J"'s vehicle was drivable following the accident. The police report further indicated that "J" was not injured as a result of the accident. In further keeping with the fact that "J" was not seriously injured, "J" did not visit any hospital emergency room following the

accident. To the extent that "J" experienced any health problems at all as the result of the accident, they were of minimal severity at the outset, and improved over time. Even so, following a purported initial examination of "J" on June 4, 2024, Demesmin and University Pain billed Liberty Mutual for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(x) On May 11, 2024, an Insured named "J" was involved in an automobile accident. The contemporaneous police report indicated that "J" had complaints of pain at the scene, and was transported to Brookdale Hospital Emergency Department. The contemporaneous hospital records indicated that "J" was briefly observed on an outpatient basis and released shortly thereafter with no serious injury diagnosis. To the extent that "J" experienced any health problems at all as the result of the accident, they were of minimal severity at the outset, and improved over time. Even so, following a purported initial examination of "J" on June 26, 2024, Demesmin and NY Pain billed Liberty Mutual for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

121. These are only representative examples. In the claims for initial examinations identified in Exhibits "1" – "2", NY Pain, University Pain, and Demesmin routinely falsely represented that the Insureds presented with problems of moderate or moderate to high severity in order to: (i) create a false basis for their charges for the examinations under CPT codes 99203 and 99204, because examinations billable under CPT codes 99203 and 99204 are reimbursable at higher rates than examinations involving presenting problems of low severity, minimal severity, or no severity; and (ii) create a false basis for the other Fraudulent Services that the Defendants purported to provide to the Insured.

**b. Misrepresentation Regarding the Amount of Time Spent on the Initial Examinations**

122. What is more, in the claims for initial examinations that are identified in Exhibit "1" – "2", the Defendants routinely misrepresented and exaggerated the amount of time that the examining practitioner – typically Demesmin – spent performing the examinations.

123. As set forth in Exhibits "1" – "2", the Defendants virtually always billed for the putative initial examinations using CPT codes 99203 or 99204, and thereby represented that the

physician – or other health care provider – who purported to perform the initial examinations spent 45 minutes of face-to-face time with the Insureds or the Insureds' families during the putative examinations when the initial examination was billed under CPT code 99204; or spent 30 minutes of face-to-face time with the Insureds or the Insureds' families when the initial examination was billed under CPT code 99203.

124. In fact, in the claims for initial examinations identified in Exhibits "1" – "2", Demesmin did not spend more than 15 minutes – let alone 30 or 45 minutes – of time purporting to perform the examinations.

125. For instance, and in keeping with the fact that the initial examinations in the claims identified in Exhibits "1" – "2" did not take more than 15 minutes to perform, Demesmin used a template in purporting to conduct the initial examinations.

126. The template that Demesmin used in purporting to conduct the initial examinations set forth a limited range of examination parameters, including brief patient interviews and limited examinations of the Insureds' musculoskeletal systems.

127. These brief patient interviews and limited examinations did not require Demesmin to spend more than 15 minutes of time on the examinations, to the extent that they were even provided at all.

128. Moreover, the purported initial examinations in the claims identified in Exhibits "1" – "2" were not legitimately performed at all, inasmuch as the outcomes of the putative examinations were pre-determined to result in false soft tissue injury diagnoses and medically unnecessary treatment recommendations, regardless of the Insureds' actual individual circumstances and presentation. These false and predetermined examinations did not require the

examining health care practitioners to spend more than 15 minutes performing the supposed examinations.

129. In the claims for initial examinations that are identified in Exhibits “1” – “2”, the Defendants routinely misrepresented the amount of time that was spent conducting the initial examinations because lengthier examinations that are billable under CPT codes 99203 or 99204 are reimbursable at higher rates than examinations that take less time to perform.

**c. Misrepresentation Regarding the Extent of Decision Making**

130. Pursuant to the CPT Assistant, there are four potential levels of medical decision-making in which a health care practitioner can engage in connection with an initial patient examination – namely: (i) straightforward medical decision-making; (ii) low complexity medical decision-making; (iii) moderate complexity medical decision-making; and (iv) high complexity medical decision-making.

131. Pursuant to the CPT Assistant, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or management options to be considered; (ii) the amount and/or complexity of the medical records, diagnostic tests, and other information to be considered; and (iii) the risk of complications, morbidity, and mortality, as well as co-morbidities associated with the patient’s presenting problems, the diagnostic procedures, and/or the possible management options.

132. Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for a patient examination represents that the physician or health care practitioner who performed the examination engaged in legitimate “low complexity” medical decision-making in connection with the examination.

133. For an initial patient examination to legitimately entail "low complexity" medical decision-making, the examination typically must, among other things, involve: (i) the review and analysis of some of the patient's medical records or information regarding the patient's history obtained from an independent historian; and (ii) at least some real risk of morbidity associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options for the patient.

134. Moreover, pursuant to the CPT Assistant, the use of CPT code 99204 to bill for a patient examination represents that the physician or health care practitioner who performed the examination engaged in legitimate "moderate complexity" medical decision-making in connection with the examination.

135. For an initial patient examination to legitimately entail "moderate complexity" medical decision-making, the examination typically must, among other things, involve: (i) chronic illness, acute illness with systemic symptoms or complications, or an undiagnosed problem with an uncertain prognosis; (ii) the review and analysis of a larger amount of the patient's medical records/history than would be required to satisfy "low complexity" medical decision-making; and (iii) at least a moderate risk of morbidity associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options for the patient.

136. As set forth above and in Exhibits "1" – "2", NY Pain, University Pain, and Demesmin billed Liberty Mutual for almost all of their putative initial patient examinations of the Insureds using CPT codes 99203 and 99204, and thereby falsely represented that the examining practitioners engaged in genuine low complexity medical decision-making or genuine moderate complexity medical decision-making, respectively, in connection with the initial examinations.

137. In fact, and to the extent that the Insureds in the claims identified in Exhibits "1" – "2" had any presenting problems at all as the result of their minor automobile accidents, the problems almost always were minor soft tissue injuries such as sprains and strains.

138. The diagnosis and treatment of these minor soft tissue injuries did not require any legitimate low complexity medical decision-making or any legitimate moderate complexity medical decision-making.

139. In actuality, the purported initial examinations did not involve any legitimate medical decision-making at all.

140. Rather, in the claims for initial examinations identified in Exhibits "1" – "2": (i) the initial examinations did not involve the retrieval, review, or analysis of any meaningful amount of medical records, diagnostic tests, or other information; (ii) there was no risk of significant complications or morbidity – much less mortality – from the Insureds' minor soft-tissue injury complaints, to the extent that they ever had any complaints arising from automobile accidents at all; and (iii) NY Pain, University Pain, Demesmin, and their associates did not consider any significant number of diagnoses or treatment options for Insureds during the initial examinations, and provided substantially similar, false, objectively unverifiable soft tissue injury "diagnoses" for almost every Insured, regardless of their true individual circumstances or presentation.

141. For example:

(i) On February 20, 2020, an Insured named "J" was involved in an automobile accident. The contemporaneous police report indicated that "J" was not injured as a result of the accident. In keeping with the fact that "J" was not seriously injured, "J" did not visit any hospital emergency room following the accident. To the extent that "J" experienced any health problems at all as the result of the accident, they were of minimal severity at the outset, and improved over time. Even so, on August 20, 2020, Demesmin purported to conduct an initial examination of "J" at University Pain. To the extent that Demesmin performed the examination in the

first instance, Demesmin did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Demesmin did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Demesmin provided "J" with the false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither "J"'s presenting problems, nor the treatment plan provided to "J" by NY Pain and Demesmin, presented any risk of significant complications, morbidity, or mortality. To the contrary, "J" did not need any significant treatment at all as a result of the accident, and the treatment plan provided by University Pain and Demesmin consisted of medically unnecessary chiropractic therapy services, which did not pose the least bit of risk to "J". Even so, University Pain and Demesmin billed Liberty Mutual for the initial examination using CPT code 99204, and thereby falsely represented that the practitioner engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(ii) On January 23, 2021, an Insured named "V" was involved in an automobile accident. The contemporaneous police report indicated that "V" was not injured as a result of the accident. In keeping with the fact that "V" was not seriously injured, "V" did not visit any hospital emergency room following the accident. To the extent that "V" experienced any health problems at all as the result of the accident, they were of minimal severity at the outset, and improved over time. Even so, on April 26, 2021, Wassef purported to conduct an initial examination of "V" at University Pain. To the extent that Wassef performed the examination in the first instance, Wassef did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Wassef did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Wassef provided "V" with the false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither "V"'s presenting problems, nor the treatment plan provided to "V" by University Pain and Wassef, presented any risk of significant complications, morbidity, or mortality. To the contrary, "V" did not need any significant treatment at all as a result of the accident, and the treatment plan provided by University Pain and Wassef consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to "V". Even so, University Pain and Demesmin billed Liberty Mutual for the initial examination using CPT code 99204, and thereby falsely represented that the practitioner engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(iii) On April 15, 2021, an Insured named "K" was involved in an automobile accident. The contemporaneous police report indicated that "K" had complaints of pain at the scene, and was transported to RWJ University Hospital Emergency Department. The contemporaneous hospital records indicated that "K" was briefly observed on an outpatient basis and released shortly thereafter with no serious injury diagnosis. To the extent that "K" experienced any health problems at all as the result of the

accident, they were of minimal severity at the outset, and improved over time. Even so, on May 10, 2021, Demesmin purported to conduct an initial examination of “K” at University Pain. To the extent that Demesmin performed the examination in the first instance, Demesmin did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Demesmin did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Demesmin provided “K” with the false list of objectively unverifiable soft tissue injury “diagnoses” that he provided to other Insureds. Furthermore, neither “K”’s presenting problems, nor the treatment plan provided to “K” by University Pain and Demesmin, presented any risk of significant complications, morbidity, or mortality. To the contrary, “K” did not need any significant treatment at all as a result of the accident, and the treatment plan provided by University Pain and Demesmin consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to “K”. Even so, University Pain and Demesmin billed Liberty Mutual for the initial examination using CPT code 99204, and thereby falsely represented that the practitioner engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(iv) On June 17, 2021, an Insured named “S” was involved in an automobile accident. The contemporaneous police report indicated that “S”’s vehicle was drivable following the accident. The police report further indicated that “S” was not injured as a result of the accident. In keeping with the fact that “S” was not seriously injured, “S” did not visit any hospital emergency room following the accident. To the extent that “S” experienced any health problems at all as the result of the accident, they were of minimal severity at the outset, and improved over time. Even so, on September 2, 2021, Demesmin purported to conduct an initial examination of “S” at NY Pain. To the extent that Demesmin performed the examination in the first instance, Demesmin did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Demesmin did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Demesmin provided “S” with the false list of objectively unverifiable soft tissue injury “diagnoses” that he provided to other Insureds. Furthermore, neither “S”’s presenting problems, nor the treatment plan provided to “S” by NY Pain and Demesmin, presented any risk of significant complications, morbidity, or mortality. To the contrary, “S” did not need any significant treatment at all as a result of the accident, and the treatment plan provided by NY Pain and Demesmin consisted of medically unnecessary chiropractic services, which did not pose the least bit of risk to “S”. Even so, NY Pain and Demesmin billed Liberty Mutual for the initial examination using CPT code 99204, and thereby falsely represented that the practitioner engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(v) On August 7, 2021, an Insured named “E” was involved in an automobile accident. The contemporaneous police report indicated that “E”’s vehicle was drivable

following the accident. The police report further indicated that "E" was not injured as a result of the accident. In keeping with the fact that "E" was not seriously injured, "E" did not visit any hospital emergency room following the accident. To the extent that "E" experienced any health problems at all as the result of the accident, they were of minimal severity at the outset, and improved over time. Even so, on August 25, 2021, Demesmin purported to conduct an initial examination of "E" at NY Pain. To the extent that Demesmin performed the examination in the first instance, Demesmin did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Demesmin did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Demesmin provided "E" with the false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither "E"'s presenting problems, nor the treatment plan provided to "E" by NY Pain and Demesmin, presented any risk of significant complications, morbidity, or mortality. To the contrary, "E" did not need any significant treatment at all as a result of the accident, and the treatment plan provided by NY Pain and Demesmin consisted of medically unnecessary chiropractic therapy services, which did not pose the least bit of risk to "E". Even so, NY Pain and Demesmin billed Liberty Mutual for the initial examination using CPT code 99204, and thereby falsely represented that the practitioner engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(vi) On March 15, 2022, an Insured named "T" was involved in an automobile accident. The contemporaneous police report indicated that "T"'s vehicle was drivable following the accident. The police report further indicated that "T" was not injured as a result of the accident. In keeping with the fact that "T" was not seriously injured, "T" did not visit any hospital emergency room following the accident. To the extent that "T" experienced any health problems at all as the result of the accident, they were of minimal severity at the outset, and improved over time. Even so, on June 13, 2022, Demesmin purported to conduct an initial examination of "T" at University Pain. To the extent that Demesmin performed the examination in the first instance, Demesmin did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Demesmin did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Demesmin provided "T" with the false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither "T"'s presenting problems, nor the treatment plan provided to "T" by University Pain and Demesmin, presented any risk of significant complications, morbidity, or mortality. To the contrary, "T" did not need any significant treatment at all as a result of the accident, and the treatment plan provided by University Pain and Demesmin consisted of medically unnecessary chiropractic services, which did not pose the least bit of risk to "T". Even so, University Pain and Demesmin billed Liberty Mutual for the initial examination using CPT code 99204, and thereby falsely

represented that the practitioner engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(vii) On May 11, 2022, an Insured named "B" was involved in an automobile accident. "B" self presented to Capital Health Medical Center following the accident. The contemporaneous hospital records indicated that "B" was briefly observed on an outpatient basis and released shortly thereafter with no serious injury diagnosis. To the extent that "B" experienced any health problems at all as the result of the accident, they were of minimal severity at the outset, and improved over time. Even so, on February 22, 2023, Demesmin purported to conduct an initial examination of "B" at University Pain. To the extent that Demesmin performed the examination in the first instance, Demesmin did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Demesmin did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Demesmin provided "B" with the false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither "B" 's presenting problems, nor the treatment plan provided to "B" by University Pain and Demesmin, presented any risk of significant complications, morbidity, or mortality. To the contrary, "B" did not need any significant treatment at all as a result of the accident, and the treatment plan provided by University Pain and Demesmin consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to "B". Even so, University Pain and Demesmin billed Liberty Mutual for the initial examination using CPT code 99204, and thereby falsely represented that the practitioner engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(viii) On August 3, 2022, an Insured named "F" was involved in an automobile accident. The contemporaneous police report indicated that "F" was not injured as a result of the accident. In keeping with the fact that "F" was not seriously injured, "F" did not visit any hospital emergency room following the accident. To the extent that "F" experienced any health problems at all as the result of the accident, they were of minimal severity at the outset, and improved over time. Even so, on April 26, 2023, Demesmin purported to conduct an initial examination of "F" at University Pain. To the extent that Demesmin performed the examination in the first instance, Demesmin did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Demesmin did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Demesmin provided "F" with the false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither "F"'s presenting problems, nor the treatment plan provided to "F" by University Pain and Demesmin, presented any risk of significant complications, morbidity, or mortality. To the contrary, "F" did not need any significant treatment at all as a result of the accident, and the treatment plan provided by University Pain and Demesmin consisted of medically unnecessary physical therapy services, which did not pose

the least bit of risk to "F". Even so, University Pain and Demesmin billed Liberty Mutual for the initial examination using CPT code 99204, and thereby falsely represented that the practitioner engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(ix) On September 7, 2022, an Insured named "A" was involved in an automobile accident. The contemporaneous police report indicated that "A" had complaints of pain at the scene, and was transported to NSLIJ Hospital Emergency Department. The contemporaneous hospital records indicated that "A" was briefly observed on an outpatient basis and released shortly thereafter with no serious injury diagnosis. To the extent that "A" experienced any health problems at all as the result of the accident, they were of minimal severity at the outset, and improved over time. Even so, on April 17, 2023, Wassef purported to conduct an initial examination of "A" at NY Pain. To the extent that Wassef performed the examination in the first instance, Wassef did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Wassef did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Wassef provided "A" with the false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither "A" 's presenting problems, nor the treatment plan provided to "A" by NY Pain and Wassef, presented any risk of significant complications, morbidity, or mortality. To the contrary, "A" did not need any significant treatment at all as a result of the accident, and the treatment plan provided by NY Pain and Wassef consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to "A". Even so, NY Pain and Demesmin billed Liberty Mutual for the initial examination using CPT code 99204, and thereby falsely represented that the practitioner engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(x) On May 11, 2024, an Insured named "J" was involved in an automobile accident. The contemporaneous police report indicated that "J" had complaints of pain at the scene, and was transported to Brookdale Hospital Emergency Department. The contemporaneous hospital records indicated that "J" was briefly observed on an outpatient basis and released shortly thereafter with no serious injury diagnosis. To the extent that "J" experienced any health problems at all as the result of the accident, they were of minimal severity at the outset, and improved over time. Even so, on June 26, 2024, Demesmin purported to conduct an initial examination of "J" at NY Pain. To the extent that Demesmin performed the examination in the first instance, Demesmin did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Demesmin did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Demesmin provided "J" with the false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither "J"'s presenting problems, nor the treatment plan provided to "J" by NY Pain and

Demesmin, presented any risk of significant complications, morbidity, or mortality. To the contrary, "J" did not need any significant treatment at all as a result of the accident, and the treatment plan provided by NY Pain and Demesmin consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to "J". Even so, NY Pain and Demesmin billed Liberty Mutual for the initial examination using CPT code 99203, and thereby falsely represented that the practitioner engaged in some legitimate, low complexity medical decision-making during the purported examination.

142. These are only representative examples. In the claims for initial examinations identified in Exhibits "1" – "2", NY Pain, University Pain, and Demesmin routinely falsely represented that the examinations entailed legitimate, low or moderate-complexity medical decision-making, when in fact they did not.

143. There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

144. An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

145. As set forth above, in the claims identified in Exhibits "1" – "2", the Insureds who purportedly received treatment from NY Pain, University Pain, and Demesmin were involved in relatively minor accidents.

146. It is improbable that any two or more Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibits "1" – "2" would suffer substantially identical injuries as the result of their accidents, or require a substantially identical course of treatment.

147. It likewise is improbable that two or more Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibits "1" – "2" would present for an initial

examination with substantially identical symptoms, and receive substantially identical diagnoses, on or about the exact same date after their underlying automobile accident.

148. It is even more improbable – to the point of impossibility – that this would occur with great frequency within a cohort of patients treating at individual practices such as NY Pain and University Pain.

149. Even so, in keeping with the fact that their putative "diagnoses" were false, and in keeping with the fact that their putative initial examinations involved no actual medical decision-making at all, NY Pain, University Pain, and Demesmin – and their associates working under their direction – frequently issued substantially identical, false "diagnoses", on or around the same date, to more than one Insured involved in a single accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds, despite the fact that they were differently situated.

150. For example:

(i) On July 3, 2020, two Insureds – "B" and "P" – were involved in the same automobile accident. Thereafter, both Insureds presented at University Pain for initial examinations on the exact same date, December 17, 2020. "B" and "P" were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that "B" and "P" suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, University Pain and Demesmin caused "B" and "P" to be provided with false, substantially similar soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(ii) On October 22, 2020, two Insureds – "C" and "G" – were involved in the same automobile accident. Thereafter, both Insureds presented at University Pain for initial examinations on the exact same date, January 7, 2021. "C" and "G" were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that "C" and "G" suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, University Pain and Demesmin caused "C" and "G" to be provided with false,

substantially similar soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them

(iii) On January 12, 2021, two Insureds – "R" and "S" – were involved in the same automobile accident. Thereafter, both Insureds presented at University Pain for initial examinations on the exact same date, April 7, 2021. "R" and "S" were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that "R" and "S" suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, University Pain and Demesmin caused "R" and "S" to be provided with false, substantially similar soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(iv) On July 24, 2021, two Insureds – "J" and "M" – were involved in the same automobile accident. Thereafter, both Insureds presented at NY Pain for initial examinations on the exact same date, October 7, 2021. "J" and "M" were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that "J" and "M" suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, NY Pain and Demesmin caused "J" and "M" to be provided with false, substantially similar soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(v) On September 23, 2021, two Insureds – "G" and "M" – were involved in the same automobile accident. Thereafter, both Insureds presented at NY Pain for initial examinations on the exact same date, December 14, 2021. "G" and "M" were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that "G" and "M" suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, NY Pain and Demesmin caused "G" and "M" to be provided with false, substantially similar soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(vi) On November 7, 2021, two Insureds – "R" and "S" – were involved in the same automobile accident. Thereafter, both Insureds presented at NY Pain for initial examinations on the exact same date, December 14, 2021. "R" and "S" were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that "R" and "S" suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, NY Pain and Demesmin caused "R" and "S" to be provided with false, substantially similar soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(vii) On November 14, 2021, two Insureds – "B" and "A" – were involved in the same automobile accident. Thereafter, both Insureds presented at NY Pain for initial examinations on the exact same date, January 12, 2022. "B" and "A" were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that "B" and "A" suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, NY Pain and Demesmin caused "B" and "A" to be provided with false, substantially similar soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(viii) On May 11, 2022, two Insureds – "B" and "J" – were involved in the same automobile accident. Thereafter, both Insureds presented at University Pain for initial examinations, with "J" presenting on June 8, 2022 and "B" presenting on February 22, 2023. "B" and "J" were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that "B" and "J" suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, University Pain and Demesmin caused "B" and "J" to be provided with false, substantially similar soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(ix) On October 23, 2023, two Insureds – "D" and "L"– were involved in the same automobile accident. Thereafter, both Insureds presented at University Pain for initial examinations on the exact same date, February 7, 2024. "D" and "L" were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that "D" and "L" suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, University Pain and Demesmin caused "D" and "L" to be provided with false, substantially similar soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(x) On September 3, 2024, two Insureds – "A" and "J" – were involved in the same automobile accident. Thereafter, both Insureds presented at University Pain for initial examinations on the exact same date, October 16, 2024. "A" and "J" were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that "A" and "J" suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, University Pain and Demesmin caused "A" and "J" to be provided with false, substantially similar soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

151. These are only representative examples. In the claims for initial examinations that are identified in Exhibits “1” – “2”, NY Pain, University Pain, and Demesmin frequently caused the issuance of substantially similar “diagnoses”, on or about the same date, to more than one Insured involved in a single accident, and recommended a substantially similar course of medically unnecessary “treatment” to the Insureds, despite the fact that the Insureds were differently situated and, in any case, did not require the treatment.

152. NY Pain, University Pain, and Demesmin routinely caused these false “diagnoses” to be included in their initial examination reports in order to create the false impression that the initial examinations required some legitimate medical decision-making, and in order to create a false justification for the other Fraudulent Services that NY Pain, University Pain, and Demesmin purported to provide to the Insureds.

153. In the claims for initial examinations identified in Exhibits “1” – “2”, NY Pain, University Pain, and Demesmin routinely falsely represented that the putative examinations involved legitimate, low or moderate complexity medical decision making in order to create a false basis to bill for the initial examinations under CPT code 99203 and 99204, because examinations billable under CPT codes 99203 and 99204 are reimbursable at a higher rate than examinations or examinations that do not require any complex medical decision-making at all.

**E. The Fraudulent Charges for Follow-Up Examinations by NY Pain, University Pain, and Demesmin**

154. In addition to their fraudulent initial examinations, NY Pain, University Pain, and Demesmin often purported to subject the Insureds in the claims identified in Exhibits “1” – “2” to one or more fraudulent follow-up examination(s) during the course of their fraudulent treatment and billing protocol.

155. As set forth in Exhibits “1” – “2”, NY Pain, University Pain, and Demesmin then billed the follow-up examinations to Liberty Mutual under CPT code 99213.

156. In the claims for follow-up examinations identified in Exhibits “1” – “2”, the charges for the follow-up examinations were fraudulent in that they misrepresented NY Pain, University Pain, and Demesmin’s eligibility to collect PIP Benefits in the first instance.

157. In fact, and as set forth herein, NY Pain, University Pain, and Demesmin never were eligible to collect PIP Benefits in the claims for follow-up examinations that are identified in Exhibits “1” – “2” because they engaged in unlawful and fraudulent conduct as described herein.

158. As set forth below, NY Pain, University Pain, and Demesmin’s charges for the follow-up examinations identified in Exhibits “1” – “2” were also fraudulent in that they misrepresented the nature, extent, and results of the purported follow-up examinations.

**a. Misrepresentations Regarding the Severity of the Insureds’ Presenting Problems**

159. Pursuant to the CPT Assistant, the use of CPT code 99213 to bill for a follow-up examination typically represents – among other things – that the patient presented with problems of low to moderate severity at the time of the examination.

160. The CPT Assistant provides various clinical examples of moderate to high severity presenting problems that would support the use of CPT code 99213 to bill for a follow-up patient examination, namely:

(i) Follow-up visit with a 55-year-old male for management of hypertension, mild fatigue, on beta blocker/thiazide regimen. (Family Medicine/Internal Medicine)

(ii) Follow-up office visit for an established patient with stable cirrhosis of the liver. (Gastroenterology)

(iii) Outpatient visit with 37-year-old male, established patient, who is 3 years post total colectomy for chronic ulcerative colitis, presents for increased irritation at his stoma. (General Surgery)

(iv) Routine, follow-up office evaluation at three-month interval for a 77-year-old female with nodular small cleaved-cell lymphoma. (Hematology/Oncology)

(v) Follow-up visit for a 70-year-old diabetic hypertensive patient with recent change in insulin requirement. (Internal Medicine/Nephrology)

(vi) Quarterly follow-up visit for a 45-year-old male, with stable chronic asthma, on steroid and bronchodilator therapy. (Pulmonary Medicine)

(vii) Office visit with 80-year-old female established patient, for follow-up osteoporosis, status-post compression fractures. (Rheumatology)

161. Accordingly, pursuant to the CPT Assistant, the low to moderate severity presenting problems that could support the use of CPT code 99213 to bill for a follow-up patient examination typically are problems that pose a serious threat to the patient's health, or even the patient's life.

162. However, to the extent that the Insureds in the claims identified in Exhibits "1" – "2" suffered any injuries at all in their automobile accidents, the injuries were virtually always minor soft tissue injuries such as sprains and strains, which were of minimal severity, even at their onset.

163. Minor soft tissue injuries such as sprains and strains virtually always resolve after a short course of conservative treatment or no treatment at all. By the time the Insureds in the claims identified in Exhibits "1" – "2" presented for their putative follow-up examinations – typically weeks or months after their minor accidents – the Insureds either did not have any genuine presenting problems at all as a result of their minor automobile accidents, or else their presenting problems were minimal.

164. Even so, in the claims for the follow-up examinations identified in Exhibits "1" – "2", NY Pain, University Pain, and Demesmin represented that the Insureds presented with problems of low to moderate severity, when in fact the Insureds' problems were minimal severity

soft tissue injuries such as sprains and strains, to the limited extent that they had any presenting problems at all at the time of the purported examinations.

165. In the claims for follow-up examinations identified in Exhibits "1" – "2", NY Pain, University Pain, and Demesmin routinely falsely represented that the Insureds presented with problems of low to moderate severity in order to: (i) create a false basis for their charges for the examinations under CPT code 99213, because examinations billable under CPT code 99213 are reimbursable at higher rates than examinations involving presenting problems of minimal severity, or no severity; and (ii) create a false basis for the other Fraudulent Services that NY Pain, University Pain, and Demesmin purported to provide to the Insureds.

**b. Misrepresentations Regarding the Nature, Extent, and Results of the Follow-Up Examinations**

166. What is more, in the claims for follow-up examinations identified in Exhibits "1" – "2", neither Demesmin, nor any other health care practitioner associated with NY Pain and University Pain, took any legitimate patient histories, conducted any legitimate physical examinations, or engaged in any legitimate medical decision-making at all.

167. Rather, following the purported follow-up examinations, Demesmin – or other health care practitioners working at NY Pain and University Pain's direction – simply: (i) reiterated the false, boilerplate "diagnoses" from the Insureds' initial examinations; and either (ii) referred the Insureds for even more medically unnecessary physical therapy services, despite the fact that the Insureds purportedly already had received extensive physical therapy services that supposedly had not been successful in resolving their purported pain symptoms; or (iii) discharged the Insureds from "treatment", to the extent that their PIP Benefits had been exhausted.

168. The bogus "follow-up examinations" that NY Pain, University Pain, and Demesmin purported to provide to the Insureds in the claims identified in Exhibits "1" – "2" therefore were

medically useless, and played no legitimate role in the treatment or care of the Insureds, because the putative "results" of the examinations were prearranged to comport with the medically unnecessary treatment plan that was pre-determined for each Insured from the moment they walked into NY Pain and University Pain.

### F. The Fraudulent Charges for Electrodiagnostic Testing by University Pain and Demesmin

169. Based upon the fraudulent, pre-determined findings and diagnoses provided during the Defendants' initial and follow-up examinations, and the Defendants' unlawful referral scheme, University Pain and Demesmin purported to subject many of the Insureds in the claims identified in Exhibit "2" to a series of medically unnecessary EDX tests, specifically nerve conduction velocity ("NCV") tests.

170. As set forth in Exhibit "2", University Pain and Demesmin then billed the EDX tests to Liberty Mutual under CPT codes 95909, 95911, 95912 and/or 95913.

171. In the claims for EDX tests identified in Exhibit "2", the charges for the EDX tests were fraudulent in that the EDX tests were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to the phony boilerplate "findings" and "diagnoses" that the Defendants purported to provide during their phony initial and follow-up examinations, and the Defendants' unlawful referral scheme.

172. Moreover, in the claims for EDX tests identified in Exhibit "2", the charges for the EDX tests were fraudulent in that they misrepresented University Pain and Demesmin's eligibility to collect PIP Benefits in the first instance.

173. In fact, University Pain and Demesmin never were eligible to collect PIP Benefits in connection with the claims identified in Exhibit "2", because – as a result of the fraudulent and unlawful conduct described herein – University Pain and Demesmin, and the EDX tests, were not

in compliance with all significant laws and regulations governing health care practice and/or licensing laws in New Jersey and New York.

**1. The Human Nervous System and Electrodiagnostic Testing**

174. The human nervous system is composed of the brain, spinal cord, spinal nerve roots, and peripheral nerves that extend throughout the body, including through the arms and legs and into the hands and feet. Two primary functions of the nervous system are to collect and relay sensory information through the nerve pathways into the spinal cord and up to the brain, and to transmit signals from the brain into the spinal cord and through the peripheral nerves to initiate muscle activity throughout the body.

175. The nerves responsible for collecting and relaying sensory information to the brain are called sensory nerves, and the nerves responsible for transmitting signals from the brain to initiate muscle activity throughout the body are called motor nerves. The peripheral nervous system consists of both sensory and motor nerves. They carry electrical impulses throughout the body, from the spinal cord and extending, for example, into the hands and feet through the arms and legs.

176. The segments of nerves closest to the spine and through which impulses travel between the peripheral nerves and the spinal cord are called the nerve roots. A "pinched" nerve root is called a radiculopathy, and can cause various symptoms including pain, altered sensation, altered reflexes on examination, and loss of muscle control.

177. NCV tests are a form of electrodiagnostic tests, and purportedly were provided by University Pain and Demesmin because they were medically necessary to determine whether the Insureds had radiculopathies.

178. The American Association of Neuromuscular Electrodiagnostic Medicine ("AANEM"), which consists of thousands of neurologists and physiatrists and is dedicated solely to the scientific advancement of neuromuscular medicine, has adopted a recommended policy (the "Recommended Policy") regarding the optimal use of electrodiagnostic medicine in the diagnosis of various forms of neuropathies, including radiculopathies.

179. The Recommended Policy accurately reflects the demonstrated utility of various forms of electrodiagnostic tests, and has been endorsed by two other premier professional medical organizations, the American Academy of Neurology and the American Academy of Physical Medicine and Rehabilitation.

**2. The Fraudulent NCV Tests**

180. NCV tests are non-invasive tests in which peripheral nerves in the arms and legs are stimulated with an electrical impulse to cause the nerve to depolarize. The depolarization, or "firing," of the nerve is transmitted, measured and recorded with electrodes attached to the surface of the skin. An EMG/NCV machine then documents the timing of the nerve response (the "latency"), the magnitude of the response (the "amplitude"), and the speed at which the nerve conducts the impulse over a measured distance from one stimulus location to another (the "conduction velocity").

181. In addition, the EMG/NCV machine displays the changes in amplitude over time as a "waveform." The amplitude, latency, velocity, and shape of the response then should be compared with well-defined normal values to identify the existence, nature, extent, and specific location of any abnormalities in the sensory and motor nerve fibers.

182. There are several motor and sensory peripheral nerves in the arms and legs that can be tested with NCV tests. Moreover, most of these peripheral nerves have both sensory and motor nerve fibers, either or both of which can be tested with NCV tests.

183. F-wave and H-reflex studies are additional types of NCV tests that may be conducted in addition to the sensory and motor nerve NCV tests. F-wave and H-reflex studies generally are used to derive the time required for an electrical impulse to travel from a stimulus site on a nerve in the peripheral part of a limb, up to the spinal cord, and then back again. The motor and sensory NCV studies are designed to evaluate nerve conduction in nerves within a limb.

184. According to the Recommended Policy, the maximum number of NCV tests necessary to diagnose a radiculopathy in 90 percent of all patients is: (i) NCV tests of three motor nerves; (ii) NCV tests of two sensory nerves; and (iii) two H-reflex studies.

185. In an attempt to extract the maximum billing out of each Insured who supposedly received NCV tests, University Pain and Demesmin routinely purported to test far more nerves per patient than recommended by the Recommended Policy. Specifically, to maximize the fraudulent charges that they could submit to Liberty Mutual and other insurers University Pain and Demesmin routinely purported to perform and/or provide: (i) NCV tests of 4-8 motor nerves; (ii) NCV tests of 4-10 sensory nerves; as well as (iii) multiple F-wave studies.

186. For example:

(i) On January 21, 2021, University Pain and Demesmin purported to provide 4 motor nerve NCV tests, 4 sensory nerve NCV tests, and multiple F-wave studies and H-reflex studies to an Insured named “P” supposedly to determine whether “P” suffered from a radiculopathy.

(ii) On February 25, 2021, University Pain and Demesmin purported to provide 4 motor nerve NCV tests, 4 sensory nerve NCV tests, and multiple F-wave studies and H-reflex studies to an Insured named “D”, supposedly to determine whether “D” suffered from a radiculopathy.

(iii) On April 23, 2021, University Pain and Demesmin purported to provide 4 motor nerve NCV tests, 4 sensory nerve NCV tests, and multiple F-wave studies and H-reflex studies to an Insured named "A", supposedly to determine whether "A" suffered from a radiculopathy.

(iv) On September 29, 2022, University Pain and Demesmin purported to provide 4 motor nerve NCV tests, 4 sensory nerve NCV tests, and multiple H-reflex studies to an Insured named "R", supposedly to determine whether "R" suffered from a radiculopathy.

(v) On November 18, 2022, University Pain and Demesmin purported to provide 4 motor nerve NCV tests, 6 sensory nerve NCV tests, and multiple F-wave studies and H-reflex studies to an Insured named "A", supposedly to determine whether "A" suffered from a radiculopathy.

187. These are only representative examples. In the substantial majority of the claims for NCV tests identified in Exhibit "2", University Pain and Demesmin routinely purported to perform and/or provide an excessive number of NCV tests to the Insureds, ostensibly to determine whether the Insureds suffered from radiculopathies.

188. University Pain and Demesmin routinely purported to provide and/or perform NCVs on far more nerves than recommended by the Recommended Policy so as to maximize the fraudulent charges that they could submit to Liberty Mutual and other insurers, not because the NCVs were medically necessary to determine whether the Insureds had radiculopathies.

189. Furthermore, the decision of which peripheral nerves to test in each limb and whether to test the sensory fibers, motor fibers, or both sensory and motor fibers in any such peripheral nerve must be tailored to each patient's unique circumstances.

190. In a legitimate clinical setting, this decision is determined based upon a history and physical examination of the individual patient, as well as the real-time results obtained as the NCV tests are performed on particular peripheral nerves and their sensory and/or motor fibers. As a result, the nature and number of the peripheral nerves and the type of nerve fibers tested with NCV tests should vary from patient-to-patient.

191. This concept is emphasized in the Recommended Policy, which states that:

> EDX studies [such as NCVs] are individually designed by the electrodiagnostic consultant for each patient. The examination design is dynamic and often changes during the course of the study in response to new information obtained.

192. This concept also is emphasized in the CPT Assistant, which states that "Pre-set protocols automatically testing a large number of nerves are not appropriate."

193. University Pain and Demesmin did not tailor the NCVs they purported to perform and/or provide to the unique circumstances of each individual Insured.

194. Instead, University Pain and Demesmin applied a fraudulent "protocol" and purported to perform and/or provide NCVs on the same peripheral nerves and nerve fibers in almost all of the claims identified in Exhibit "2".

195. Specifically, in virtually every claim for NCV testing identified in Exhibit "2", University Pain and Demesmin purported to test some combination of the following peripheral nerves and nerve fibers – and, in many cases, all of them – for each Insured to whom they purported to provide NCV tests:

(i) left and right median motor nerves;

(ii) left and right peroneal motor nerves;

(iii) left and right tibial motor nerves;

(iv) left and right ulnar motor nerves;

(v) left and right median sensory nerves;

(vi) left and right radial sensory nerves;

(vii) left and right sural sensory nerves; and

(viii) left and right ulnar sensory nerves

196. The cookie-cutter approach to the NCVs University Pain and Demesmin purported to provide to Insureds clearly was not based on medical necessity. Instead, the cookie-cutter approach to the NCVs was designed solely to maximize the charges that University Pain and Demesmin could submit to Liberty Mutual and other insurers, and to maximize their ill-gotten profits.

**3. The Fraudulent Radiculopathy Diagnoses**

197. Radiculopathies are relatively rare in motor vehicle accident victims, occurring in – at most – only 19 percent of accident victims according to a large-scale, peer-reviewed 2009 study conducted by Randall L. Braddom, M.D., Michael H. Rivner, M.D., and Lawrence Spitz, M.D. and published in Muscle & Nerve, the official journal of the AANEM.

198. Furthermore, the cohort of accident victims considered in the study by Drs. Braddom, Rivner, and Spitz had been referred to a tertiary EDX testing laboratory at a major university teaching hospital, and therefore represented a more severely injured group of patients than the Insureds whom University Pain and Demesmin purported to treat.

199. As a result, the frequency of radiculopathy in all motor vehicle accident victims – not only those who have relatively serious injuries that require referral to a major hospital EDX laboratory – is significantly lower than 19 percent.

200. As set forth above, the substantial majority of the Insureds whom University Pain and Demesmin purportedly treated did not suffer any serious medical problems as the result of any automobile accident, much less any radiculopathies.

201. Even so, in the NCV claims identified in Exhibit "2", University Pain and Demesmin falsely purported to identify radiculopathies in the substantial majority of the Insureds to whom they purported to provide NCV testing.

202. University Pain and Demesmin purported to arrive at their pre-determined radiculopathy "diagnoses" in order to create the appearance of severe injuries and thereby provide a false justification for the laundry-list of medically unnecessary Fraudulent Services that the Defendants purported to provide

**G. The Fraudulent Charges for Pain Management Injections by NY Pain, University Pain, and Demesmin**

203. As set forth in Exhibits "1" and "2", pursuant to the Defendants' unlawful referral scheme, and based upon the phony, boilerplate "diagnoses" that NY Pain, University Pain, and Demesmin provided during their fraudulent examinations and EDX tests, NY Pain, University Pain, and Demesmin purported to subject many Insureds to a series of medically unnecessary pain management injections, including but not limited to epidural injections, facet injections, and medial branch blocks, often purportedly performed under fluoroscopic guidance or with epidurography.

204. As set forth in Exhibits "1" and "2", NY Pain, University Pain, and Demesmin then billed the pain management injections to Liberty Mutual under CPT codes 62287, 62290, 62310, 62321, 62323, 64483, 64484, 64490, 64491, 64492, 64493, 64494, 64495, among other codes.

205. Demesmin purported to personally administer the majority of the pain management injections in the claims identified in Exhibits "1" and "2".

206. Like the charges for the other Fraudulent Services, the charges for the pain management injections identified in Exhibits "1" and "2" were fraudulent in that the injections were medically unnecessary, and were performed pursuant to the Defendants' unlawful referral scheme, and the phony, boilerplate "diagnoses" that NY Pain, University Pain, and Demesmin provided to the Insureds at the conclusion of the putative examinations.

207. Moreover, in the claims for pain management injections identified in Exhibits "1" and "2", the charges for the pain management injections were fraudulent in that they misrepresented NY Pain, University Pain, and Demesmin's eligibility to collect PIP Benefits in the first instance.

208. In fact, NY Pain, University Pain, and Demesmin never were eligible to collect PIP Benefits in connection with the claims identified in Exhibits "1" and "2", because – as a result of the fraudulent scheme described herein – neither they nor the injections were in compliance with all significant laws and regulations and/or licensing laws governing healthcare practice.

**1. Basic, Legitimate Use of Pain Management Injections**

209. Generally, when a patient presents with a soft tissue injury such as a sprain or strain secondary to an automobile accident, the initial standard of care is conservative treatment comprised of rest, ice, compression, and – if applicable – elevation of the affected body part.

210. If that sort of conservative treatment does not resolve the patient's symptoms, the standard of care can include other conservative treatment modalities such as chiropractic treatment, physical therapy, and the use of pain management medication.

211. The substantial majority of soft tissue injuries such as sprains and strains will resolve over a period of weeks through this sort of conservative treatment, or no treatment at all.

**2. The Medically Unnecessary Pain Management Injections**

212. As set forth above, almost all of the Insureds in the claims identified in Exhibits "1" and "2" were involved in relatively minor accidents.

213. To the limited extent that the Insureds in the claims identified in Exhibits "1" and "2" experienced any injuries at all in their minor accidents, the injuries virtually always were minor soft tissue injuries such as sprains and strains.

214. By the time the Insureds in the claims identified in Exhibits "1" and "2" presented to NY Pain, University Pain, and Demesmin for treatment, they either had no presenting problems at all or their presenting problems consisted of minor sprains and strains that were in the process of being resolved through conservative treatment, or without any treatment at all.

215. Even so, in the claims for pain management injections identified in Exhibits "1" and "2", NY Pain, University Pain, and Demesmin routinely provided pain management injections to Insureds who did not have any serious symptoms secondary to any automobile accident that legitimately would warrant the injections.

216. For example:

(i) On January 23, 2021, an Insured named "V" was involved in an automobile accident. The contemporaneous police report indicated that "V" was not injured as a result of the accident. In keeping with the fact that "V" was not seriously injured, "V" did not visit any hospital emergency room following the accident. To the extent that "V" experienced any health problems at all as the result of the accident, they were of minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, NY Pain, Demesmin, or some other health care provider acting on his behalf and at his direction, purported to provide "V" with a medically unnecessary epidural steroid injection on May 27, 2021, a medically unnecessary epidural steroid injection June 10, 2021, and another epidural steroid injection on December 9, 2021. The medically unnecessary injections were administered between five and 11 months after "V"'s accident, after any legitimate symptoms "V" may have experienced as the result of the accident had resolved.

(ii) On June 17, 2021, an Insured named "S" was involved in an automobile accident. The contemporaneous police report indicated that "S"'s vehicle was drivable following the accident. The police report further indicated that "S" was not injured as a result of the accident. In keeping with the fact that "S" was not seriously injured, "S" did not visit any hospital emergency room following the accident. To the extent that "S" experienced any health problems at all as the result of the accident, they were of minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, NY Pain, Demesmin, or some other health care provider acting on his behalf and at his direction, purported to provide "S" with medically unnecessary pain management injections on September 17, 2021. The medically unnecessary injections were administered three months after "S"'s accident, after any legitimate symptoms "S" may have experienced as the result of the accident had resolved.

(iii) On June 20, 2021, an Insured named "N" was involved in an automobile accident. The contemporaneous police report indicated that "N" had complaints of pain at the scene, and was transported to Mercy Medical Center Emergency Department. The contemporaneous hospital records indicated that "N" was briefly observed on an outpatient basis and released shortly thereafter with no serious injury diagnosis. To the extent that "N" experienced any health problems at all as the result of the accident, they were of minimal severity at the outset, and improved over time. Even so NY Pain, Demesmin, or some other health care provider acting on his behalf and at his direction, purported to provide "N" with a medically unnecessary epidural steroid injection on November 15, 2021, a medically unnecessary trigger point injection and epidural steroid injection on December 10, 2021, and a medically unnecessary epidural steroid injection on July 8, 2022. The medically unnecessary injections were administered between five and 13 months after "N"'s accident, after any legitimate symptoms "N" may have experienced as the result of the accident had resolved.

(iv) On August 3, 2022, an Insured named "F" was involved in an automobile accident. The contemporaneous police report indicated that "F" was not injured as a result of the accident. In keeping with the fact that "F" was not seriously injured, "F" did not visit any hospital emergency room following the accident. To the extent that "F" experienced any health problems at all as the result of the accident, they were of minimal severity at the outset, and improved over time. Even so University Pain, Demesmin, or some other health care provider acting on his behalf and at his direction, purported to provide "F" with a medically unnecessary epidural steroid injection on May 16, 2023. The medically unnecessary injection was administered nine months after "F"'s accident, after any legitimate symptoms "F" may have experienced as the result of the accident had resolved.

(v) On September 1, 2022, an Insured named "J" was involved in an automobile accident. The contemporaneous police report indicated that "J"'s vehicle was drivable following the accident. The police report further indicated that "J" was not injured as a result of the accident. In further keeping with the fact that "J" was not seriously injured, "J" did not visit any hospital emergency room following the accident. To the extent that "J" experienced any health problems at all as the result of the accident, they were of minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, NY Pain, Demesmin, or some other health care provider acting on his behalf and at his direction, purported to provide "J" with a medically unnecessary facet injection on February 17, 2023. The medically unnecessary injection was administered four months after "J"'s accident, after any legitimate symptoms "J" may have experienced as the result of the accident had resolved.

217. These are only representative examples. In the claims for pain management injections identified in Exhibits "1" and "2", NY Pain, University Pain, and Demesmin routinely

purported to provide medically unnecessary pain management injections to Insureds, despite the fact that the Insureds had not suffered any injuries in their accidents that would warrant the injections.

218. NY Pain, University Pain, and Demesmin's pre-determined treatment protocol, including subjecting patients to medically unwarranted pain management injections, was designed and employed by NY Pain, University Pain, and Demesmin solely to maximize the potential charges that they could submit, and cause to be submitted, to Liberty Mutual, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to the injections.

**H. University Pain, Stemmee, and Demesmin's Unlawful Self-Referrals for Pain Management Injections**

219. Not only did University Pain and Demesmin fraudulently submit inflated charges for medically unnecessary services, but many of University Pain, Stemmee, and Demesmin's charges were the product of illegal self-referrals between and among University Pain, Demesmin, and Stemmee.

220. As set forth above, the Codey Law provides – in substance – that a "practitioner" may not refer a patient to a "health care service" in which the practitioner has a "significant beneficial interest". See N.J.S.A. 45:9-22.5.

221. In the context of the Codey Law, Demesmin – who is a licensed physician – was a "practitioner[]". See N.J.S.A. 45:9-22.4.

222. In the context of the Codey Law, University Pain and Stemmee were "health care services", in that they were "business entit[ies] which provide[d] on an inpatient or outpatient basis: … diagnosis or treatment of human disease or dysfunction …." Id.

223. In the context of the Codey Law, Demesmin – who owned University Pain and Stemmee – had a "significant beneficial interest" in both of University Pain and Stemmee. Id.

224. In the context of the Codey Law, Stemmee was an "surgical practice registered with the Department of Health".

225. Notwithstanding his respective significant beneficial/ownership interests in University Pain and Stemmee, Demesmin routinely self-referred – or directed his employees to self-refer – Insureds to University Pain and Stemmee for medically unnecessary pain management injections.

226. Following Demesmin's self-referral of Insureds to University Pain and Stemmee for medically unnecessary pain management injections, Liberty Mutual would receive two separate bills, one for the injections which were billed through University Pain and a separate bill for surgical facility fees attendant to the injections which were billed through Stemmee.

227. These self-referrals violated the Codey Law, inasmuch as none of the exceptions to the Codey Law applied to these self-referrals.

228. The exception in the Codey Law, for "medical treatment or a procedure that is provided at the practitioner's medical office", did not apply to the self-referrals for these injections because the injections were performed at Stemmee, which was a surgical facility, not Demesmin's medical office.

229. Nor did the ASC Exception apply to these self-referrals, because the pain management injections did not legitimately qualify as ambulatory surgery or procedures requiring or involving the use of anesthesia. To the contrary, all of the anesthesia services attendant to University Pain's pain management injections – i.e., sedation – were medically unnecessary.

230. For example, in a legitimate clinical setting, pain management injections such as epidural injections and facet joint injections generally do not require anesthesia.

231. Indeed, according to a review of the literature published in Pain Physician, the official journal of the American Society of Interventional Pain Physicians, "[m]ost practice guidelines discourage the routine use of sedation for interventional pain procedures."

232. Along similar lines, the American Society of Anesthesiologists has specified that "the majority of minor pain procedures, under most routine circumstances, do not require anesthesia care other than local anesthesia. Such procedures include epidural steroid injections, epidural blood patch, trigger point injections, sacroiliac joint injections, bursal injections, and occipital nerve block and facet joint injections."

233. Sedation generally is unwarranted in the context of interventional pain procedures such as pain management injections because the risk attendant to sedation outweighs any prospective benefit to the patient.

234. Not only can sedation itself induce adverse events, including death, but patients receiving pain management injections should remain awake and alert to warn the treating physician of adverse events relating to the underlying injections.

235. Nonetheless, Demesmin routinely and unlawfully self-referred Liberty Mutual Insureds to University Pain and Stemmee to receive pain management injections, including but not limited to the following self-referrals of the following Insureds:

(i) On or about December 22, 2020, an Insured named "A".

(ii) On or about May 11, 2021, an Insured named "P".

(iii) On or about May 18, 2021, an Insured named "A".

(iv) On or about July 12, 2022, an Insured named "T".

(v) On or about January 24, 2023, an Insured named "B".

(vi) On or about March 14, 2023, an Insured named "J".

(vii) On or about May 9, 2023, an Insured named "D".

(viii) On or about May 9, 2023, an Insured named "M".

(ix) On or about May 16, 2023, an Insured named "D".

(x) On or about May 16, 2023, an Insured named "F".

(xi) On or about October 20, 2023, an Insured named "N".

(xii) On or about November 28, 2023, an Insured named "S".

(xiii) On or about March 22, 2024, an Insured named "J".

(xiv) On or about May 28, 2024, an Insured named "M".

(xv) On or about November 26, 2024, an Insured named "J".

236. These are only representative examples of Demesmin's unlawful self-referrals to University Pain and Stemmee.

237. These referrals also violated New York Public Health Law § 238-d, inasmuch as – upon information and belief based upon the treatment and billing materials submitted to Liberty Mutual – Demesmin failed to disclose his ownership interest in University Pain and Stemmee to the Insureds, and failed to inform the Insureds of their right to utilize a specifically identified alternative health care provider if any such alternative was reasonably available, which they were.

## III. <u>The Fraudulent and Unlawful Billing Submitted to Liberty Mutual</u>

238. To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted thousands of bills and treatment reports through NY Pain, University Pain, and Stemmee containing thousands of fraudulent charges, seeking payment for the Fraudulent Services for which they were not entitled to receive payment.

239. The bills and treatment reports were false and misleading in the following material respects:

(i) The bills and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to Liberty Mutual that the Defendants were in compliance with all significant statutory and regulatory requirements governing health care practice and/or licensing laws, and therefore were eligible to receive PIP reimbursement. In fact, for the reasons set forth herein, the Defendants were not in compliance with all significant statutory and regulatory requirements governing health care practice and/or licensing laws in New Jersey and New York, and therefore were not eligible to receive PIP reimbursement.

(ii) The bills and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to Liberty Mutual that the Fraudulent Services were provided in compliance with all significant statutory and regulatory requirements governing health care practice in New York and New Jersey and/or licensing laws, and therefore were eligible for PIP reimbursement. In fact, for the reasons set forth herein, the Fraudulent Services were not provided in compliance with all significant statutory and regulatory requirements governing health care practice and/or licensing laws in New Jersey and New York, and therefore were not eligible for PIP reimbursement.

(iii) The bills and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to Liberty Mutual that the Fraudulent Services were medically necessary and, in many cases, misrepresented to Liberty Mutual that the Fraudulent Services actually were performed in the first instance. In fact, the Fraudulent Services frequently were not performed at all and, to the extent that they were performed, they were not medically necessary and were performed as part of a pre–determined fraudulent treatment, referral, and billing protocol designed solely to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to it.

240. The bills and treatment reports submitted or caused to be submitted by the Defendants misrepresented and exaggerated the level of the Fraudulent Services, the nature of the Fraudulent Services that purportedly were provided, the results of the Fraudulent Services, and the reimbursable amounts for the Fraudulent Services.

## IV. <u>The Defendants' Fraudulent Concealment and Liberty Mutual's Justifiable Reliance</u>

241. The Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to Liberty Mutual.

242. To induce Liberty Mutual to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants systemically concealed their fraud and went to great lengths to accomplish this concealment.

243. For instance, the Defendants knowingly misrepresented and concealed facts in order to prevent Liberty Mutual from discovering that the Fraudulent Services were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to a fraudulent, pre–determined protocol designed to maximize the charges that could be submitted, not to benefit the Insureds who supposedly were subjected to it.

244. Likewise, the Defendants knowingly misrepresented and concealed facts in order to prevent Liberty Mutual from discovering that the Fraudulent Services frequently were never performed in the first instance.

245. In addition, the Defendants knowingly misrepresented and concealed facts in order to prevent Liberty Mutual from discovering that the Fraudulent Services were performed, to the extent that they are performed at all, pursuant to an illegal referral scheme.

246. The Defendants hired law firms to pursue collection of the fraudulent charges from Liberty Mutual and other insurers. These law firms routinely filed expensive and time–consuming arbitrations against Liberty Mutual and other insurers if the charges were not promptly paid in full.

247. Liberty Mutual is under statutory and contractual obligations to promptly and fairly process claims. The facially–valid documents submitted to Liberty Mutual in support of the fraudulent charges at issue, combined with the material misrepresentations and omissions described above, were designed to and did cause Liberty Mutual to rely upon them. As a result, Liberty Mutual has incurred damages of more than $1,189,000.00.

248. Based upon the Defendants' material misrepresentations, omissions, and other affirmative acts to conceal their fraud from Liberty Mutual, Liberty Mutual did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

**FIRST CAUSE OF ACTION**
**Against NY Pain, University Pain, and Stemmee**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

249. Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 248 above.

250. There is an actual case in controversy between Liberty Mutual and NY Pain, University Pain, and Stemmee, regarding more than $75,000.00 in unpaid billing for the Fraudulent Services that has been submitted to Liberty Mutual through NY Pain, University Pain, and Stemmee.

251. NY Pain, University Pain, and Stemmee, have no right to receive payment for any pending bills submitted to Liberty Mutual because of the fraudulent and unlawful activities described herein.

252. Accordingly, Liberty Mutual requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that NY Pain, University Pain, and Stemmee have no right to receive payment for any pending bills submitted to Liberty Mutual.

**SECOND CAUSE OF ACTION**
**Against Demesmin**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

253. Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 248 above.

254. NY Pain is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

255. Demesmin knowingly conducted and/or participated, directly or indirectly, in the conduct of NY Pain's affairs through a pattern of racketeering activities consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that NY Pain was not entitled to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary; (ii) the billed-for services were performed and billed pursuant to a pre–determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the Defendants were engaged in an unlawful referral scheme; (iv) the billed-for services, in many cases, were not performed at all; (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; and (vi) neither NY Pain nor the underlying services were in compliance with applicable law. The fraudulent charges and corresponding mailings submitted to Liberty Mutual that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

256. NY Pain's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Demesmin has operated NY Pain, inasmuch as NY Pain is not engaged in a legitimate medical practice, and acts of mail fraud therefore are essential in order for NY Pain to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Demesmin

continues to submit fraudulent billing to Liberty Mutual, and continues to attempt collection on the fraudulent billing submitted through NY Pain to the present day.

257. NY Pain is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to Liberty Mutual and other insurers. These inherently unlawful acts are taken by NY Pain in pursuit of inherently unlawful goals – namely, the theft of money from Liberty Mutual and other insurers through fraudulent No-Fault billing.

258. Liberty Mutual has been injured in its business and property by reason of the above–described conduct in that it has paid at least $177,000.00 pursuant to the fraudulent bills submitted through NY Pain.

259. By reason of its injury, Liberty Mutual is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## THIRD CAUSE OF ACTION
**Against NY Pain and Demesmin**
**(Common Law Fraud)**

260. Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 248 above.

261. NY Pain and Demesmin intentionally and knowingly made false and fraudulent statements of material fact to Liberty Mutual and concealed material facts from Liberty Mutual in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

262. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim identified in Exhibit "1" the representation that NY Pain and Demesmin were in compliance with all significant laws and regulations governing health care

practice, when in fact they were not; (ii) in every claim identified in Exhibit "1", the representation that NY Pain and Demesmin were eligible to receive PIP Benefits, when in fact they were not; (iii) in every claim identified in Exhibit "1", concealment of the Defendants' illegal kickback and referral scheme; (iv) in every claim identified in Exhibit "1", the representation that the Fraudulent Services were medically necessary, and in some cases actually performed, when in fact the Fraudulent Services were not medically necessary, in some cases were not performed at all, and were performed – to the extent that they were performed at all – as part of a pre-determined fraudulent treatment and billing protocol designed to financially enrich NY Pain and Demesmin, not to benefit the Insureds who supposedly were subjected to them; and (v) in every claim identified in Exhibit "1", the representation that the Fraudulent Services were provided in compliance with the laws and regulations governing health care practice, and were eligible for PIP reimbursement, when in fact they were not.

263. NY Pain and Demesmin intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce Liberty Mutual to pay charges submitted through NY Pain that were not compensable.

264. Liberty Mutual justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid at least $177,000.00 pursuant to the fraudulent bills submitted by the Defendants through NY Pain.

265. NY Pain and Demesmin's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Liberty Mutual to recover punitive damages.

266. Accordingly, by virtue of the foregoing, Liberty Mutual is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**FOURTH CAUSE OF ACTION**
**Against NY Pain and Demesmin**
**(Unjust Enrichment)**

267. Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 248 above.

268. As set forth above, NY Pain and Demesmin have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Liberty Mutual.

269. When Liberty Mutual paid the bills and charges submitted or caused to be submitted by NY Pain and Demesmin through NY Pain for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

270. NY Pain and Demesmin have been enriched at Liberty Mutual's expense by Liberty Mutual's payments which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

271. NY Pain and Demesmin's retention of Liberty Mutual's payments violates fundamental principles of justice, equity and good conscience.

272. By reason of the above, NY Pain and Demesmin have been unjustly enriched in an amount to be determined at trial, but in no event less than $177,000.00.

**FIFTH CAUSE OF ACTION**
**Against Demesmin**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

273. Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 248 above.

274. University Pain is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

275. Demesmin knowingly conducted and/or participated, directly or indirectly, in the conduct of University Pain's affairs through a pattern of racketeering activities consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over five years seeking payments that University Pain was not entitled to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary; (ii) the billed-for services were performed and billed pursuant to a pre–determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the Defendants were engaged in an unlawful referral scheme; and (iv) neither University Pain nor the underlying services were in compliance with applicable law. The fraudulent charges and corresponding mailings submitted to Liberty Mutual that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2".

276. University Pain's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Demesmin has operated University Pain, inasmuch as University Pain is not engaged in a legitimate medical practice, and acts of mail fraud therefore are essential in order

for University Pain to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Demesmin continues to submit fraudulent billing to Liberty Mutual, and continues to attempt collection on the fraudulent billing submitted through University Pain to the present day.

277. University Pain is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to Liberty Mutual and other insurers. These inherently unlawful acts are taken by University Pain in pursuit of inherently unlawful goals – namely, the theft of money from Liberty Mutual and other insurers through fraudulent No-Fault billing.

278. Liberty Mutual has been injured in its business and property by reason of the above–described conduct in that it has paid at least $860,000.00 pursuant to the fraudulent bills submitted through University Pain.

279. By reason of its injury, Liberty Mutual is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**SIXTH CAUSE OF ACTION**
**Against University Pain and Demesmin**
**(Common Law Fraud)**

280. Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 248 above.

281. University Pain and Demesmin intentionally and knowingly made false and fraudulent statements of material fact to Liberty Mutual and concealed material facts from Liberty Mutual in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

282. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim identified in Exhibit "2" the representation that University Pain and Demesmin were in compliance with all significant laws and regulations governing health care practice, when in fact they were not; (ii) in every claim identified in Exhibit "2", the representation that University Pain and Demesmin were eligible to receive PIP Benefits, when in fact they were not; (iii) in every claim identified in Exhibit "2", concealment of the Defendants' illegal kickback and referral scheme; (iv) in every claim identified in Exhibit "2", the representation that the Fraudulent Services were medically necessary, and in some cases actually performed, when in fact the Fraudulent Services were not medically necessary, in some cases were not performed at all, and were performed – to the extent that they were performed at all – as part of a pre-determined fraudulent treatment and billing protocol designed to financially enrich University Pain and Demesmin, not to benefit the Insureds who supposedly were subjected to them; and (v) in every claim identified in Exhibit "2", the representation that the Fraudulent Services were provided in compliance with the laws and regulations governing health care practice, and were eligible for PIP reimbursement, when in fact they were not.

283. University Pain and Demesmin intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce Liberty Mutual to pay charges submitted through University Pain that were not compensable.

284. Liberty Mutual justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid at least $860,000.00 pursuant to the fraudulent bills submitted by the Defendants through University Pain.

285. University Pain and Demesmin's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Liberty Mutual to recover punitive damages.

286. Accordingly, by virtue of the foregoing, Liberty Mutual is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**SEVENTH CAUSE OF ACTION**
**Against University Pain and Demesmin**
**(Unjust Enrichment)**

287. Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 248 above.

288. As set forth above, University Pain and Demesmin have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Liberty Mutual.

289. When Liberty Mutual paid the bills and charges submitted or caused to be submitted by University Pain and Demesmin through University Pain for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

290. University Pain and Demesmin have been enriched at Liberty Mutual's expense by Liberty Mutual's payments which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

291. University Pain and Demesmin's retention of Liberty Mutual's payments violates fundamental principles of justice, equity and good conscience.

292. By reason of the above, University Pain and Demesmin have been unjustly enriched in an amount to be determined at trial, but in no event less than $860,000.00.

**EIGHTH CAUSE OF ACTION**
**Against Demesmin**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

293. Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 248 above.

294. Stemmee is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce. Demesmin knowingly conducted and/or participated, directly or indirectly, in the conduct of Stemmee's affairs through a pattern of racketeering activities consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over four years seeking payments that Stemmee was not entitled to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary; (ii) the billed-for services were performed and billed pursuant to a pre–determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the Defendants were engaged in an unlawful referral scheme; and (iv) neither Stemmee nor the underlying services were in compliance with applicable law. The fraudulent charges and corresponding mailings submitted to Liberty Mutual that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3".

295. Stemmee's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Demesmin has operated Stemmee, inasmuch as Stemmee is not engaged in a legitimate medical practice, and acts of mail fraud therefore are essential in order for Stemmee to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts

of mail fraud implies a threat of continued criminal activity, as does the fact that Stemmee continues to submit fraudulent billing to Liberty Mutual, and continues to attempt collection on the fraudulent billing submitted through Stemmee to the present day.

296. Stemmee is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to Liberty Mutual and other insurers. These inherently unlawful acts are taken by Stemmee in pursuit of inherently unlawful goals – namely, the theft of money from Liberty Mutual and other insurers through fraudulent No-Fault billing.

297. Liberty Mutual has been injured in its business and property by reason of the above–described conduct in that it has paid at least $151,000.00 pursuant to the fraudulent bills submitted through Stemmee.

298. By reason of its injury, Liberty Mutual is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**NINTH CAUSE OF ACTION**
**Against Stemmee and Demesmin**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

299. Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 248 above.

300. Stemmee is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

301. Demesmin and University Pain are employed by and/or associated with the Stemmee enterprise.

302. Demesmin and University Pain knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Stemmee enterprise's affairs,

through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for more than four years seeking payments that Stemmee was not entitled to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary; (ii) the billed-for services were performed and billed pursuant to a pre–determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the Defendants were engaged in an unlawful referral scheme; and (iv) neither Stemmee nor the underlying services were in compliance with applicable law. The fraudulent charges and corresponding mailings submitted to Liberty Mutual that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3". Each such mailing was made in furtherance of the mail fraud scheme.

303. Demesmin and University Pain knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud Liberty Mutual and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to Liberty Mutual.

304. Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at least $151,000.00 pursuant to the fraudulent bills submitted through Stemmee.

305. By reason of its injury, Liberty Mutual is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**<u>TENTH CAUSE OF ACTION</u>**
**Against Stemmee and Demesmin**
**(Common Law Fraud)**

306. Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 248 above.

307. Stemmee and Demesmin intentionally and knowingly made false and fraudulent statements of material fact to Liberty Mutual and concealed material facts from Liberty Mutual in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

308. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim identified in Exhibit "3" the representation that Stemmee and Demesmin were in compliance with all significant laws and regulations governing health care practice, when in fact they were not; (ii) in every claim identified in Exhibit "3", the representation that Stemmee and Demesmin were eligible to receive PIP Benefits, when in fact they were not; (iii) in every claim identified in Exhibit "3", concealment of the Defendants' illegal kickback and referral scheme; (iv) in every claim identified in Exhibit "3", the representation that the Fraudulent Services were medically necessary, and in some cases actually performed, when in fact the Fraudulent Services were not medically necessary, in some cases were not performed at all, and were performed – to the extent that they were performed at all – as part of a pre-determined fraudulent treatment and billing protocol designed to financially enrich Stemmee and Demesmin, not to benefit the Insureds who supposedly were subjected to them; and (v) in every claim identified in Exhibit "3", the representation that the Fraudulent Services were provided in compliance with the laws and regulations governing health care practice, and were eligible for PIP reimbursement, when in fact they were not.

309. Stemmee and Demesmin intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce Liberty Mutual to pay charges submitted through Stemmee that were not compensable under New Jersey's No-Fault Laws.

310. Liberty Mutual justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid at least $151,000.00 pursuant to the fraudulent bills submitted by the Defendants through Stemmee.

311. Stemmee and Demesmin's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Liberty Mutual to recover punitive damages.

312. Accordingly, by virtue of the foregoing, Liberty Mutual is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## ELEVENTH CAUSE OF ACTION
**Against University Pain and Demesmin**
**(Aiding and Abetting Fraud)**

313. Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 248 above.

314. University Pain and Demesmin knowingly aided and abetted the fraudulent scheme that was perpetrated on Liberty Mutual by Stemmee.

315. The acts of Demesmin and University Pain in furtherance of the fraudulent scheme involve self-referring Insureds to Stemmee for medically unnecessary services pursuant to the unlawful patient referral scheme set forth herein.

316. The conduct of Demesmin and University Pain was significant and material. The conduct of Demesmin and University Pain was a necessary part of and was critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Stemmee and Demesmin to obtain payment from Liberty Mutual and from other insurers.

317. Demesmin and University Pain aided and abetted the fraudulent scheme in a calculated effort to induce Liberty Mutual into paying charges to Stemmee for non-reimbursable and medically unnecessary Fraudulent Services, because they sought to continue profiting through the fraudulent scheme.

318. The conduct of Demesmin and University Pain caused Liberty Mutual to pay more than $151,000.00 pursuant to the fraudulent bills submitted or caused to be submitted through Stemmee.

319. Demesmin and University Pain's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Liberty Mutual to recover punitive damages.

320. Accordingly, by virtue of the foregoing, Liberty Mutual is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## TWELFTH CAUSE OF ACTION
**Against Stemmee and Demesmin**
**(Unjust Enrichment)**

321. Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 248 above.

322. As set forth above, Stemmee and Demesmin have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Liberty Mutual.

323. When Liberty Mutual paid the bills and charges submitted or caused to be submitted by Stemmee and Demesmin for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

324. Stemmee and Demesmin have been enriched at Liberty Mutual's expense by Liberty Mutual's payments which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

325. Stemmee and Demesmin's retention of Liberty Mutual's payments violates fundamental principles of justice, equity and good conscience.

326. By reason of the above, Stemmee and Demesmin have been unjustly enriched in an amount to be determined at trial, but in no event less than $151,000.00.

## JURY DEMAND

327. Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation, The First Liberty Insurance Corporation, LM Insurance Corporation, Liberty Mutual Mid-Atlantic Insurance Company, Liberty County Mutual Insurance Company, LM Property and Casualty Insurance Company, Safeco Company of Indiana, and American States Insurance Company demand that a Judgment be entered in their favor:

A. On the First Cause of Action against NY Pain, University Pain, and Stemmee, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that NY Pain, University Pain, and Stemmee, have no right to receive payment for any pending bills submitted to Liberty Mutual;

B. On the Second Cause of Action against Demesmin, compensatory damages in favor of Liberty Mutual an amount to be determined at trial but in excess of $177,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C. On the Third Cause of Action against NY Pain and Demesmin, compensatory damages in favor of Liberty Mutual an amount to be determined at trial but in excess of $177,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

D. On the Fourth Cause of Action against NY Pain and Demesmin, more than $177,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

E. On the Fifth Cause of Action against Demesmin, compensatory damages in favor of Liberty Mutual an amount to be determined at trial but in excess of $860,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

F. On the Sixth Cause of Action against University Pain and Demesmin, compensatory damages in favor of Liberty Mutual an amount to be determined at trial but in excess of $860,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

G. On the Seventh Cause of Action against University Pain and Demesmin, more than $860,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

H. On the Eighth Cause of Action against Demesmin, compensatory damages in favor of Liberty Mutual an amount to be determined at trial but in excess of $151,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

I. On the Ninth Cause of Action against Stemmee and Demesmin, compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $151,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

J. On the Tenth Cause of Action against Stemmee and Demesmin, compensatory damages in favor of Liberty Mutual an amount to be determined at trial but in excess of $151,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

K. On the Eleventh Cause of Action against University Pain and Demesmin, compensatory damages in favor of Liberty Mutual an amount to be determined at trial but in excess of $151,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

L. On the Twelfth Cause of Action against Stemmee and Demesmin, more than $151,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

Dated: August 14, 2026

RIVKIN RADLER LLP

By: /s/ *Max Gershenoff*

Barry I. Levy, Esq. (BL 2190)
Max Gershenoff, Esq. (MG 4648)
Nabeel Gadit, Esq. (NG 0065)
Peter Henninger, Esq. (PH 4482)
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs*